**PRESBYTERIAN AND REFORMED PUBLISHING CO., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 83–3309.

United States Court of Appeals, Third Circuit.

Argued April 23, 1984.

Decided Aug. 29, 1984.

---

Leonard J. Henzke, Jr. (argued), William J. Lehrfeld, Lehrfeld & Henzke, P.C., Washington, D.C., for appellant.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Robert A. Bernstein, Laurie A. Snyder (argued), Tax Div., Dept. of Justice, Washington, D.C., for appellee.

Before ADAMS, BECKER, Circuit Judges, and SAROKIN, District Judge [*].

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This is an appeal from a decision of the United States Tax Court affirming the Internal Revenue Service's (IRS) revocation of tax-exempt status for a religiously-oriented publishing house. The Tax Court's decision affirming the termination of the publisher's 52-year-old tax-exemption under 26 U.S.C. § 501(c)(3) (1982),[1] was based on its conclusion that the publisher had become a profitable venture with only an attenuated relationship to the church with which it claims an affiliation. For the reasons set forth below, the decision of the Tax Court will be reversed.

## I.

In 1931, the Presbyterian and Reformed Publishing Company (P & R) was incorporated to

> ... state, defend and ·disseminate (through every proper means connected with or incidental to the printing and publishing business) the system of belief and practice taught in the Bible, as that system is now set forth in the Confession of Faith and Catechisms of the Presbyterian Church in the United States of America....

App. at R–131. P & R's charter requires that any income otherwise available as a dividend be used to improve its publications, extend their influence, or assist institutions "engaged in the teaching or inculcating" of the "system of belief and practice" of the Orthodox Presbyterian Church (OPC). *Id.*

The IRS granted P & R tax-exempt status in 1939, stating,

> Your actual activities consist of publishing a religious paper known as "Christianity Today," a Presbyterian journal devoted to stating, defending, and furthering the gospel. Your income is derived from subscriptions, contributions and gifts and is used to defray maintenance and general operating expenses.

App. at R–132.

From the beginning, P & R has been closely linked—although not formally affiliated—with the OPC, a Presbyterian group dedicated to its view of reformed Presbyte-

---

[*] Hon. H. Lee Sarokin, United States District Court for the District of New Jersey, sitting by designation.

1. 26 U.S.C. § 501(c)(3) provides a list of organizations eligible for tax-exempt status:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

rian theology and, in particular, to the doctrine of Biblical Christianity set forth in the Westminster Confession of Faith. P & R's central editorial criterion is whether a book chosen for publication would make a "worthy contribution ... to the reformed [Presbyterian] community." App. at R–140. One independent publisher characterized P & R's books as lacking in "common ground" with the "nonreformed mind" and "offensive" to all but the "truly reformed." App. at Ex. 52–A2.

One of P & R's three incorporators and original directors founded the OPC in 1932, one year after P & R's incorporation. Seven of P & R's nine directors are either officials at Westminster Theological Seminary of Philadelphia or pastors of OPC or OPC-affiliated denominations. On January 1, 1976, P & R changed its charter to specify OPC's seminary, the Westminster Theological Seminary of Philadelphia, as the recipient of all P & R assets in case of dissolution, citing Westminster's common dedication to Biblical Christianity and the Westminster Confession.

The organizational structure of P & R further underscores its close ties to the OPC. Since 1931, the publishing house has been run by three successive generations of the Craig family. Samuel, Charles, and Bryce Craig each worked without compensation at what amounted to a family concern whose business was conducted at the Craigs' kitchen table; all three Craigs were ministers. The record is devoid of evidence indicating any lessening of ties between P & R and the OPC.

From its inception until 1969, the company could claim no income over and above expenses. Indeed, the Craigs themselves often contributed personal funds in order to keep the corporation afloat (Samuel donated $500 in 1939 and $3,000 in 1954; Charles donated a total of $19,600 from 1955 to 1963). Until 1973, P & R relied exclusively on volunteers to help the Craigs with editing, packing, shipping, and clerical work.

Beginning in 1969, however, P & R experienced a considerable increase in economic activity as a result of the sudden and unexpected popularity of books written by Jay Adams, a Westminster Theological faculty member. P & R reported gross profits of over $20,000 for 1969, almost twice as much in 1970, and subsequent escalations culminating in over $300,000 in gross profits in 1979. App. at R–138. By 1979, P & R had seven paid employees assisting Bryce Craig, one with a salary of $12,500, and five with salaries under $6,250 (all five full-time employees were OPC officials or members). Bryce Craig himself began receiving a salary of $12,000 in 1976, which increased, to $15,350 by 1979.

As early as March 2, 1974, P & R notified the Internal Revenue Service that it was accumulating surplus cash as a "building fund." In 1976, P & R used this fund to purchase 5–½ acres of land in Harmony, New Jersey, close to both an OPC community and Harmony Press, the printer for both P & R and OPC. In 1978, construction of a combined warehouse and office building in Harmony was completed at a cost of $263,000; an additional $27,000 was spent in 1979 for equipment.

After an audit, the IRS issued a revocation of P & R's tax-exempt status in 1980 on the grounds that P & R was not "operating exclusively for purposes set forth in 501(c)(3)" and was "engaged in a business activity which is carried on similar to a commercial enterprise." The IRS made this revocation retroactive, to apply from January 1, 1969 onward.

The Tax Court affirmed the revocation in a December 23, 1982 opinion, 79 Tax Court 1070, but held that the IRS abused its discretion in making the revocation retroactive to 1969. Instead, it set the effective revocation date at 1975, based upon its declaration that as of that year P & R "had acquired a truly commercial hue" and the company "was aware ... that IRS agents had been raising serious questions [about its exemption]." App. at R–160. To support its determination that P & R came to be "animated" by a substantial commercial [and thus nonexempt] purpose" in 1975, App. at R–147, the Tax Court relied primar-

ily on three lines of evidence: first, P & R's "soar[ing] net and gross profits" between 1969 and 1979; second, the fact that P & R set prices which generated "consistent and comfortable net profit margins," rather than lowering prices to encourage a broader readership; and, third, P & R's purchase and sale of books to and from Baker Book Stores (a commercial publishing house), which "must have ... overlapp[ed] in subject matter" with commercial publishers. App. at R–149–52. The Tax Court deemed this sufficient to support the proposition that P & R was in "competition with commercial publishers." App. at R–151.[2]

On P & R's motion for reconsideration, the Tax Court issued a second opinion on April 8, 1983, leaving its prior judgment intact and rejecting P & R's argument that its "profit" figures should have been adjusted to reflect accumulations for the building fund. The Tax Court suggested that the new building furthered commercial purposes as much as religious purposes, and noted that "gross profit margins" did not fall after the building was completed. App. at R–222–23. Finally, the Tax Court emphasized that P & R's accumulations exceeded its expenditures for the new building. P & R's motion to reconsider also sought to distinguish its OPC-affiliated activity from that of generic Christian publishers. The Tax Court rejected this point, stating that "the denominational or nondenominational character of an organization has never been a controlling criterion." App. at R–224.

## II.

The principal issue we must address is at what point the successful operation of a tax-exempt organization should be deemed to have transformed that organization into a commercial enterprise and thereby to have forfeited its tax exemption. The Tax Court answered this question by looking at the composite effects of the broad-scale increase in commercial activity, the accumulation of capital, the company's "profitability," and the development of a professional staff. Although these indicia of non-exempt business activity are all relevant, we are troubled by the inflexibility of the Tax Court's approach. It is doubtful that any small-scale exempt operation could ever increase its economic activity without forfeiting tax-exempt status under such a definition of non-exempt commercial character. Thus, we believe that the statutory inclusion or exclusion of P & R should be considered under a two-prong test: first, what is the purpose of an organization claiming tax-exempt status; and, second, to whose benefit does its activity inure?

This two-prong inquiry is drawn directly from the wording of § 501(c)(3) and the legislative history of its enactment. The statute explicitly cites as qualifying for tax exemption those entities "organized exclusively for religious, charitable ... or educational purposes." Indeed, the statute's original sponsor cited the religious publishing house as the archetypal example of the

---

**2.** The Tax Court appended a list of additional "profit motivated" decisions:

Other activities as well indicate that petitioner was animated by a substantial commercial purpose. It consciously attempted to transform itself into a more mainline commercial enterprise: It searched out more readers; it employed paid workers; it dropped money-losing plans; it paid substantial royalties; it made formal contracts with some authors; and, of course, it expanded into a new facility from which it could continue to reap profits. Further, petitioner was not affiliated or controlled by any particular church organization and this nondenominational character "contributes to the resemblance between its publishing activities and those of commercial, non-exempt publishers of Christian literature

with whom ... [it] competes." *Inc. Trustees of Gospel Wkr. Soc. v. United States,* [510 F.Supp. 374,] 379, n. 16 [D.D.C. (1981)]. Petitioner argues that it accumulated profits to expand so that it could publish more books and thus reach more readers. We recognize that petitioner used a large amount of its accumulated profits for the new Harmony facility; this new facility probably aided petitioner in increasing its productivity and distribution. Such increase, however, may also be indicative of a commercial enterprise. We are not convinced that one of the significant reasons for expansion was not the commercial one of wishing to expand production for profit. *Cf. Inc. Trustees of Gospel Wkr. Soc. v. United States, supra* at 379. App. at R–152–53.

contemplated tax-exempt organization. In the words of the sponsor, Senator Bacon:

> [T]he corporation which I had particularly in mind as an illustration at the time I drew this amendment is the Methodist Book Concern, which has its headquarters in Nashville, which is a very large printing establishment, and in which there must necessarily be profit made, and there is a profit made exclusively for religious, benevolent, charitable, and educational purposes, in which no man receives a scintilla of individual profit. Of course if that were the only one, it might not be a matter that you would say we would be justified in changing these provisions of law to meet a particular case, but there are in greater or less degree such institutions scattered all over this country. If Senators will mark the words, the amendment is very carefully guarded, so as not to include any institution where there is any individual profit, and further than that, where any of the funds are devoted to any purpose other than those which are religious, benevolent, charitable, and educational.

44 Cong.Rec., pt. 4, at 4151 (1909).

This passage directly supports the two-part test set forth today. The legislative history refers to a "very large printing establishment ... in which there must necessarily be profit made" as within the scope of the exemption. Significantly, Senator Bacon's remarks point to the purpose of the publishing house and the absence of personal profit, rather than the volume of business, as the hallmarks of non-taxable activity. Assuming that large religious or educational publishers may qualify for an exemption, and assuming that not all such publishers are created as large entities, the question becomes one of defining the standards by which the growth in volume of a publisher will not in itself jeopardize the tax exemption.

In the case at hand, the "purpose" prong of the two-part test is the more difficult to administer. Therefore, we will turn first to the question of inurement, and then return to the question of purpose.

## A.

In order to qualify for a § 501(c)(3) exemption, "no part of an organization's net earnings may inure to the benefit of any private shareholder or individual." Treasury regulations apply this rule to define an organization as "not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals." 26 C.F.R. § 1.501(c)(3)–1(c)(2) (1984). "Private shareholder or individual" is broadly defined as any person "having a personal and private interest in the activities of the organization." 26 C.F.R. § 1.501(a)–1(c) (1984). The policy underpinnings of the non-inurement rule derive from the common law belief that charities should promote the public good rather than private benefit. In addition, to the extent that the personnel of a religious organization, particularly a select few, materially profit from the organization's activity, the sincerity of the claimed religious beliefs may be called into question.

The non-inurement test is clearly articulated in *Founding Church of Scientology v. United States*, 412 F.2d 1197, 188 Ct.Cl. 490, *cert. denied*, 397 U.S. 1009, 90 S.Ct. 1237, 25 L.Ed.2d 422 (1969), a challenge to the denial of tax-exempt status to the Church of Scientology. Although the government attacked the church's claim for § 501(c)(3) coverage based upon both a commercial purpose and private benefit, the court reached only the latter question. Since the church allowed the leader of Scientology, L. Ron Hubbard, to receive ten per cent of the church's gross income instead of a salary, 412 F.2d at 1199, the earnings of the church directly inured to the private benefit of Mr. Hubbard. Thus, it was unnecessary to "determine whether plaintiff's operations were exclusively for religious or educational purposes." *Id.* The court reasoned that "an organization's net earnings may inure to the benefit of private individuals in ways other than by

the actual distribution of dividends or payment of excessive salaries." [3] *Id.* at 1200.

Among the numerous cases denying tax-exempt status based upon private inurement are *Basic Unit Ministry of Alma Karl Schurig v. Comm'r,* 670 F.2d 1210 (D.C.Cir.1982) (organization spent approximately 70 per cent of its income on the living expenses of 15 members); *Bubbling Well Church of Universal Love, Inc. v.. Comm'r,* 670 F.2d 104 (9th Cir.1981) (church paid sizeable salaries to three family members who were its sole employees and voting directors); *Church of the Chosen People (North American Panarchate) v. United States,* 548 F.Supp. 1247 (D.Minn.1982) (organization which taught doctrine of "Gay Imperative" found to be operated primarily for private purposes); *New Life Tabernacle v. Comm'r,* 44 T.C.M. (CCH) 309 (1982) (organization paid members' living expenses and allowances in return for their income and performance of duties); *Church of the Transfiguring Spirit, Inc. v. Comm'r,* 76 T.C. 1 (1981) (organization disbursed most of its income as allowance to two controlling ministers); *Basic Bible Church v. Comm'r,* 74 T.C. 846 (1980) (church's founder and his family received 75 per cent of church income for "subsistance"); *People of God Community v. Comm'r,* 75 T.C. 127 (1980) (under a percentage-of-gross tithes method, petitioner's three ministers received salaries totaling well over half of its budget); *The Southern Church of Universal Brotherhood Assembled Inc., v. Comm'r,* 74 T.C. 1223 (1980) (church paid living expenses of minister in return for virtually all of his income) aff'd, 647 F.2d 163 (2d Cir.1981); *Unitary Mission Church of Long Island v. Comm'r,* 74 T.C. 507 (1980) (church's minis-

ters received travel expenses, loans and fluctuating allowances); *Beth-El Ministries, Inc. v. U.S.,* 79–2 U.S.Tax Cas. (CCH) ¶ 9412 (D.D.C.1979) (organization provided members with food, clothing, shelter and support in return for their salaries and possessions); *Incorporated Trustees of the Gospel Worker Society,* 510 F.Supp. 374 (D.D.C. 1981); *Christian Manner Int'l v. Comm'r,* 71 T.C. 661 (1979) (publishing house published only its founder's two books and was determined to be primarily engaged in underwriting founder's writings).

■ There is no basis in the record for concluding that P & R's increased commercial activity inured to the personal benefit of any individual. Although the Tax Court commented on the fact that the total wages and salaries paid by the publishing company rose from under $550 in 1972 to about $57,600 in 1979, App. at R–135, a breakdown of these figures negates any suggestion of personal enrichment. In 1979 Bryce Craig was receiving $15,350, none of the seven other paid employees received annual salaries over $12,500, and five were paid under $6,250. App. at R–134. Under extant circumstances, such salaries were relatively modest.

Therefore, if P & R is to be denied tax-exempt status, it must be as a result of the first prong of the test set forward today: the purpose of P & R would have to be incompatible with § 501(c)(3).

**B.**

■ In order to come within the terms of § 501(c)(3), an organization seeking tax-exempt status must establish that it is organized "exclusively" for an exempt purpose. In the leading case elucidating the purposes considered exempt under § 501(c)(3),

---

**3.** Reasonable salaries are, of course, permissible for those employed by § 501(c)(3) organizations. As the court in *Founding Church* noted:
> By analogy to the recurring tax question in the business sphere, whether corporate officers' salaries are reasonable and deductible, or are excessive and disguise the distribution of dividends, ... several decisions indicate that the payment of reasonable salaries by an allegedly tax-exempt organization does not result in the inurement of net earnings to the

benefit of private individuals. *Birmingham Business College, Inc. v. Commissioner of Internal Revenue,* 276 F.2d [476,] 480 [ (5th Cir. 1960) ]; *Enterprise Ry. Equip. Co. v. United States* [161 F.Supp. 590, 142 Ct.Cl. 192 (1958) ]; *Mabee Petroleum Corp. v. United States,* 203 F.2d [872,] 876 [ (5th Cir.(1953) ]. Of course, as the *Birmingham Business College* and *Mabee Petroleum* cases hold, excessive salaries do result in inurement of benefit. 412 F.2d at 1200.

the Supreme Court in *Better Business Bureau v. U.S.*, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945), stated, "[t]he presence of a single [non-exempt] purpose, ... substantial in nature, will destroy the exemption." The Court found that the Better Business Bureau of the District of Columbia was not exempt because a substantial purpose was "the mutual welfare, protection and improvement of business methods among merchants." *Id.* at 281, 66 S.Ct. at 113. Nevertheless, *Better Business Bureau* is a relatively straightforward case because of the presence of an explicit non-exempt commercial purpose by the organization claiming the exemption. P & R, to the contrary, claims that it is animated by no commercial motive and therefore falls squarely within the statutory exemption. Thus, the Tax Court's decision in the present case rests on the evaluation of what it deemed to be the true but unspoken motive of P & R.

Any exploration of unarticulated or illicit purpose necessarily involves courts in difficult and murky problems. When the legality of an action depends not upon its surface manifestation but upon the undisclosed motivation of the actor, similar acts can lead to diametrically opposite legal consequences. In the field of equal protection law, for instance, similar state actions having disproportionate impacts upon minorities may be upheld or struck down depending upon the weighing of various indicia of "discriminatory intent." *Compare Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (striking down at-large election systems in Burke County, Georgia as invidiously motivated) with *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (upholding identical election scheme in Mobile, Alabama).

The difficulties inherent in any legal standard predicated upon the subjective intent of an actor are further compounded when that actor is a corporate entity.[4] In such circumstances, courts forced to pass upon a potentially illicit purpose have looked for objective indicia from which the intent of the actor may be discerned. *See, e.g., Griffin v. County School Board*, 377 U.S. 218, 230–32, 84 S.Ct. 1226, 1232–33, 12 L.Ed.2d 256 (1964) (intent in closing school to avoid desegregation order inferred from past segregative practices). In reviewing the decision of the Tax Court in the present case, therefore, the question is whether the proper indicia were relied upon in concluding that P & R was animated by a purpose alien to the statutory exemption of § 501(c)(3).

The Tax Court properly framed the inquiry as to whether P & R's purpose was within § 501(c)(3) as follows:

Where a nonexempt purpose is not an expressed goal, courts have focused on the manner in which activities themselves are carried on, implicitly reasoning that an end can be inferred from the chosen means. If, for example, an organization's management decisions replicate those of commercial enterprises, it is a fair inference that at least one purpose is commercial, and hence nonexempt. And if this nonexempt goal is substantial, tax exempt status must be denied. Clearly, petitioner's conduct of a growing and very profitable publishing business must enbue it with some commercial hue. How deep a tint these activities impart can best be evaluated by looking at certain factors deemed significant in cases involving religious publishing companies, as well as in other pertinent cases.

App. at R–147–48.

■ There are two aspects of the Tax Court's opinion regarding P & R's purpose

---

**4.** The problem of determining the collective intent of a corporate body has been most pronounced in the Fourteenth Amendment area where courts have had to assess the constitutionality of a statute based upon the intent of a legislature. *Bolden*, 446 U.S. at 92–93, 100 S.Ct. at 1513 (Stevens, J., concurring in judgment) (systems that disadvantage minorities should not be sustained simply because no motive can be proved); *Palmer v. Thompson*, 403 U.S. 217, 225, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438 (1971) (difficult or impossible for any court to determine sole or dominant motivation behind choices of group of legislators). *See also* Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive*, 1971 Sup.Ct.Rev. 95, 126.

that require careful examination. First is the Tax Court's conclusion that "petitioner was not affiliated or controlled by any particular church and [that] this nondenominational character 'contributes to the resemblance between its publishing activities and those of commercial, non-exempt publishers of Christian literature with whom ... [it] competes.'" App. at R–153, quoting *Inc. Trustees of Gospel Wkr. Soc. v. United States*, 510 F.Supp. 374, 379 n. 16 (D.D.C. 1981). Given the close connection between P & R and the OPC, the absence of formal control of P & R by any particular church is not dispositive of the question of the fundamental ties between its goals as a publishing house and the dogma espoused by the OPC. In *Inc. Trustees*, the court's decision that a gospel-oriented press failed to qualify for § 501(c)(3) status did not turn on the extent of the press' formal affiliation with a church. Rather, the court focused on the virtually complete cessation of religious activity by the church, the church's unexplained accumulation of millions of dollars, and the fact that some officers of the affiliated publishing concern were drawing salaries ranging from $42,000 to over $100,000. The Tax Court itself seems to have recognized the non-dispositive nature of formal affiliation in its decision on the motion for reconsideration, where it stated, "the denominational or nondenominational character of an organization has never been a controlling criterion." App. at R–224 (citing *Fides Publishers Ass'n v. United States*, 263 F.Supp. 924 (N.D.Ind.1967)).

The second point, P & R's accumulation of "profits," causes greater difficulty. Although the profits of P & R constituted only one of the factors enumerated and discussed by the Tax Court in its opinion, the memorandum filed upon P & R's motion for reconsideration makes clear that the Tax Court's principal concern was the "presence of substantial profits." App. at R–220. The Tax Court computed P & R's profits by subtracting the cost of goods sold from the gross sales of books to arrive at the gross profits. The sum of other expenses was in turn subtracted from the gross profits to derive the net profit schedule used by the Tax Court in determining P & R's profitability. App. at R–138. These net profits peaked at $106,180 in 1975, the year the Tax Court decided that P & R had acquired a truly commercial character. On reconsideration, the Tax Court added that the gross profits margin of P & R did not fall even after the new building was constructed. App. at R–222.

■ We do not read § 501(c)(3) or its legislative history to define the purpose of an organization claiming tax-exempt status as a direct derivative of the volume of business of that organization. Rather, the inquiry must remain that of determining the purpose to which the increased business activity is directed. As the Tax Court itself observed, "the presence of profitmaking activities is not per se a bar to qualification of an organization as exempt if the activities further or accomplish an exempt purpose." *Aid to Artisans, Inc. v. Commissioner*, 71 T.C. 202, 211 (1978).[5] Despite the long history of § 501(c)(3) and the numerous organizations that have claimed its coverage, no regulation or body of case law has defined the concept of "purpose" under this provision of the Tax Code with sufficient clarity to protect against arbitrary, ad hoc decision-making.[6]

---

5. *Fides Publishers Ass'n v. U.S.*, 263 F.Supp. 924 (N.D.Ind.1967), relied upon by the Tax Court below, would seem to suggest otherwise. The court in *Fides* upheld the revocation of a religious publisher's exempt status on the ground that the publisher made a profit. 263 F.Supp. at 935. Insofar as *Fides* is read to suggest a *per se* profits rule, we decline to accept its reasoning as contrary to the history and language of § 501(c)(3). However, *Fides* may be distinguishable on the facts. In that case, the publisher offered no reason for its accumulation of

earnings. In the immediate case, P & R clearly explained its need to expand to the IRS and the Tax Court. *See infra* n. 8.

6. The only guidance provided by the IRS regulations is found at 26 C.F.R. § 1.501(c)(3)–1(d)(ii) (1984):

An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest. Thus, to meet the require-

The Tax Court's analysis of P & R's accumulation of profits in the present context could, absent a clearer articulation of the legal standard for tax-exempt status, lead to such arbitrary or ad hoc treatment. We are particularly concerned that although the Tax Court acknowledged that P & R informed the IRS as early as March 2, 1974 of its accumulation of funds to purchase or build an office and warehouse, App. at R–137, the opinion tabulates the company's cash-on-hand, App. at R–139, and cites this as an important factor in concluding that P & R was motivated by a non-exempt purpose. App. at R–149.

There is no doubt that unexplained accumulations of cash may properly be considered as evidence of commercial purpose. Although no regulations govern cash accumulations in the 501(c)(3) context, we are guided by the accumulated earnings tax, 26 U.S.C. § 531 *et seq.* (1982). The accumulated earnings provision of the Tax Code was designed to weed out illegitimate non-payment of dividends by corporations seeking to avoid the higher tax exposure of shareholders. 26 U.S.C. § 532. A violation of this section is established by a corporation's accumulation of earnings beyond the reasonable needs of the business, 26 U.S.C. § 533, which may include reasonably anticipated future needs of the enterprise. 26 U.S.C. § 537. The legislative history of this provision reveals congressional concern that an inflexible application of the tax laws not stifle legitimate business expansion. *See* H.R.Rep. No. 1337, 83rd Cong., 2d Sess. 52 (1954); S.Rep. No. 1622, 83rd Cong., 2d Sess. 68 (1954), U.S.Code Cong. & Admin.News 1954, p. 4017. The legislative concern was directly incorporated by the IRS in its regulations,[7] particularly 26 C.F.R. § 1.537–2(b)(1) (1984) which cites as a reasonable basis for the accumulation of earnings and profits the need to "provide for bona fide expansion of business or replacement of plant ..."

Given the absence of regulations governing the accumulation of cash by § 501(c)(3) organizations, it is reasonable to take notice of the regulations developed by the IRS in 26 C.F.R. § 1.537 in reviewing the case at bar. In light of the clear notice to the IRS of P & R's need to expand its physical capacity, the claim that the accumulated profits would be used for this purpose,[8] and the recognition by the IRS of

---

ment of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.

7. 26 C.F.R. § 1.537–1(b)(1) (1984) states:
In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justi-

fied on the grounds of reasonably anticipated needs of the business.
*See also Oklahoma Press Publishing Co. v. United States,* 437 F.2d 1275, 1277 (10th Cir.1971).

8. The need to expand was recognized in the Tax Court's opinion:
Petitioner's publishing operations were initially run out of Samuel's house and later out of Charles' house in Nutley, New Jersey. Neither Samuel nor Charles received any payment or reimbursement for expenses. After Charles became a director and assumed more responsibilities, he concluded that his house in Nutley, New Jersey, was not "adequate to carry on the publishing business." Correspondence and proofs covered the dining room table; the telephone rang frequently; storage space (in a former grocery store) was insufficient. To alleviate the problem, in 1969 Charles and his wife personally purchased a house with a cinderblock truck garage in East Orange, New Jersey, for approximately $30,000. Petitioner's operations were moved to the garage while the house was rented to people unconnected with petitioner. Charles paid fire and liability insurance on the house and garage from 1969 through 1978

such expansion as a legitimate reason for cash accumulation, we are unable to affirm the Tax Court's determination that P & R's cash-on-hand situation was a strong indicator of a non-exempt purpose.

Although we recognize that the Tax Court is entitled to deference in determining the existence of a substantial, non-exempt purpose, that court must focus on facts which indicate a purpose falling outside the ambit of section 501(c)(3).[9] In this case, the Tax Court focused primarily on two factors—the lack of affiliation with a particular church and the accumulation of profits. As we have shown, neither factor indicates the presence of a non-exempt purpose here. Therefore, we must consider the balance of the record to determine whether all the evidence taken together supports a finding of non-exemption. Such an examination reveals no additional evidence of improper motives.[10]

### III.

Two competing policy considerations are present in situations where tax-exempt organizations begin to expand the scope of their profit-generating activities. On the one hand, the simple act of accumulating revenues may properly call into question the ultimate purpose of an organization ostensibly dedicated to one of the enumerated pursuits under § 501(c)(3). On the other hand, success in terms of audience reached and influence exerted, in and of itself, should not jeopardize the tax-exempt status of organizations which remain true to their stated goals.

Our concern is that organizations seeking § 501(c)(3) status may be forced to choose between expanding their audience

(the period in which he owned the property); and in 1970 he purchased and had installed a heating system for the garage at a cost of $1,460. He also received rent from petitioner sufficient to cover the real estate taxes he personally paid while leaving a modest excess for other expenses. This garage, along with Charles' home, was used by petitioner until March 1978, after which the garage property was sold, at a loss, for $28,000.

As early as March 2, 1974, petitioner informed the Internal Revenue Service (I.R.S.) that it was accumulating a surplus for a "building fund" and that it planned to purchase or build an office and warehouse. This statement was reasserted in nearly all future correspondence with the I.R.S. and in the filed Forms 990 for the years 1975 through 1977. In 1976 petitioner purchased 5-½ acres of land in Harmony, New Jersey, and, after obtaining a variance and clarifying title to the property, construction began on a combined office and warehouse building in 1977. The building was completed in 1978....

App. at R. 135–37 (footnotes omitted)

9. The Tax Court's conclusion is not entitled to the deferential, clearly erroneous standard of review of Rule 52(a) of the Federal Rules of Civil Procedure. Under *Pullman Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), certain findings of purpose by trial courts are considered findings of fact not to be overturned unless clearly erroneous. In *Bose Corp. v. Consumers Union,* — U.S. —, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), the Supreme Court clarified the application of Rule 52(a) to mixed issues of law and fact:

Rule 52(a) applies to findings of fact, including those described as "ultimate facts" because they may determine the outcome of litigation. *See Pullman-Standard v. Swint, supra,* 456 U.S., at 287 [102 S.Ct. at 1789]. But Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.... Nor does Rule 52(a) "furnish particular guidance with respect to distinguishing law from fact." *Pullman Standard v. Swint, supra,* 456 U.S., at 288 [102 S.Ct. at 1789]. What we have characterized as "the vexing nature" of that distinction, *ibid.,* does not, however, diminish its importance, or the importance of the principles that require the distinction to be drawn in certain cases.

104 S.Ct. at 1959–60.

In an earlier case involving eligibility of a religiously-affiliated school for § 501(c)(3) status, the Supreme Court reviewed the district court's determination of an institution's purpose as primarily educational or religious under a plenary standard of review. *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). Judged against the standard of review in *Bob Jones* the Tax Court's determination of P & R's purpose under an incorrect legal standard is subject to plenary review by this Court.

10. Even if we were limited to a purely factual review, but *c.f.* n. 9 *supra,* we would hold the Tax Court's finding of a substantial, non-exempt purpose to be clearly erroneous.

and influence on the one hand, and maintaining their tax-exempt status on the other. If this were a stagnant society in which various ideas and creeds preserve a hold on a fixed proportion of the population, this concern would evaporate. A large religious institution with a broad base of support, such as one of the more established churches, could be the springboard for large-scale publishing houses dedicated to advancing its doctrines and be assured of qualifying for § 501(c)(3) coverage. A small denomination, such as the OPC, could then have within its penumbra only a small-scale operation run off a kitchen table. In such circumstances, any attempt by a publisher adhering to the views of the small denomination to expand its scope of activities would properly raise questions relating to its continued eligibility for tax-exempt status.

This view does not reflect either the dynamic quality of our society or the goals that generated the grant of tax-exempt status to religious publishers. The sudden popularity of an erstwhile obscure writer, such as Jay Adams, cannot, by itself, be the basis for stating that P & R has departed from its professed purpose any more than an increase in congregations would call into question the OPC's continued designation as a church. Such a standard would lead to an inequitable disparity in treatment for publishers affiliated with mainstream churches as opposed to small offshoots.

Accordingly, the decision of the Tax Court will be reversed.