**GEISINGER HEALTH PLAN, Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

No. 92–7251.

United States Court of Appeals, Third Circuit.

Argued Dec. 3, 1992.

Decided Feb. 8, 1993.

---

Frederick J. Gerhart (argued), Lawrence J. Goode, Melissa B. Rasman, Dechert Price & Rhoads, Philadelphia, PA, for appellee.

James A. Bruton, Acting Asst. Atty. Gen., Gary R. Allen, Robert S. Pomerance, Teresa E. McLaughlin (argued), Dept. of

Justice, Tax Div., Washington, DC, for appellant.

Before: SCIRICA, ALITO and LEWIS, Circuit Judges.

## OPINION OF THE COURT

LEWIS, Circuit Judge.

The Commissioner of the Internal Revenue Service ("Commissioner" or "IRS") appeals from a Tax Court decision granting appellee Geisinger Health Plan ("GHP") tax-exempt status under 26 U.S.C. § 501(c)(3). This case requires us to decide whether a health maintenance organization (an "HMO") which serves a predominantly rural population, enrolls some Medicare subscribers, and which intends to subsidize some needy subscribers but, at present, serves only its paying subscribers, qualifies for exemption from federal income taxation under 26 U.S.C. § 501(c)(3). We hold that it does not.

We will remand this case to the Tax Court on a subsidiary issue, however. On remand, the Tax Court is to determine whether GHP should be considered an integral part of the health care system to which it belongs so as to qualify for tax-exempt status based upon the status of entities related to it.

 This court's review of the Tax Court's decision, involving as it does a determination of the purpose of an entity applying for tax-exempt status based upon stipulated facts, is plenary. *Presbyterian and Reformed Publishing Co. v. Commissioner,* 743 F.2d 148, 158 n. 9 (3d Cir.1984). The Tax Court had jurisdiction over this case based upon 26 U.S.C. §§ 7428(a)(1)(A) and 7442, and this court's jurisdiction is based upon 26 U.S.C. § 7482(a)(1).

## I.

GHP, which qualifies as an HMO under both Pennsylvania and federal law, operates as part of a system of health care organizations in northeastern and northcentral Pennsylvania (the "Geisinger System"). Under Pennsylvania law, an HMO is "an organized system which combines the delivery and financing of health care and which provides basic health services to voluntarily enrolled subscribers for a fixed prepaid fee." Pa.Stat.Ann. tit. 40, § 1553 (Supp.1991). *See also* 42 U.S.C. § 300e (1991). GHP was formed as a nonprofit corporation in 1984 and, by March 31, 1988, had enrolled 4,396 individuals and 448 groups (accounting for another 66,441 individual subscribers [1]).

The Geisinger System consists of GHP and eight other nonprofit entities. All are involved in some way in promoting health care in 27 counties in northeastern and northcentral Pennsylvania. They include: the Geisinger Foundation (the "Foundation"); Geisinger Medical Center ("GMC"); the Geisinger Clinic (the "Clinic"); Geisinger Wyoming Valley Medical Center ("GWV"); Marworth; Geisinger System Services ("GSS") and two professional liability trusts. Each of these entities is exempt from federal income taxation under one or more sections of the Internal Revenue Code (the "Code").

In order to provide cost-effective delivery of health care to areas it had identified as medically underserved, GMC experimented with a pilot prepaid health plan between 1972 and 1985. The results were sufficiently favorable that the Geisinger System formed GHP to provide its own prepaid health plan. GHP's service area encompasses 17 predominantly rural counties within the area served by the Geisinger System. As of November 30, 1987, according to a finding of a bureau of the federal Department of Health and Human Services, 23 percent of GHP's subscribers resided in medically underserved areas while 65 percent resided in counties containing medically underserved areas.

---

1. In its application for recognition of exemption, GHP refers to those who belong to it as "subscribers." Appendix at 25–36. In contrast, "members"—a term typically used to refer to customers of HMOs—are shareholders appointed by the Foundation. GHP's by-laws, appendix at 44–51. The parties have not consistently used this terminology, but to avoid confusion, we will use the terms in this manner.

GHP's articles of incorporation provide that it was incorporated "for the purpose of conducting exclusively charitable, scientific and educational activities within the meaning of Section 501(c)(3) of the Internal Revenue Code," and list a number of specific purposes relating to the provision of health care through a prepaid fee arrangement. Its articles also prohibit GHP from lobbying, participating in political campaigns and engaging in activity that would invalidate its tax-exempt status. No earnings or profit may inure to the benefit of its members, directors, officers or other private persons; upon its dissolution, GHP's board of directors must pay any assets that remain to a tax-exempt charitable organization.

Any person, whether or not a resident of Pennsylvania, may serve on GHP's board of directors. GHP's president and the senior officers of the Geisinger Foundation, the Geisinger System's umbrella organization, automatically serve as directors. The remaining directors are elected by GHP's members, who can be directors themselves. Pennsylvania law requires that at least one-third of GHP's directors be GHP subscribers.

GHP has two types of subscribers. First, it is open to all adult individuals who reside in its service area and satisfactorily complete a routine questionnaire regarding their medical history. From its inception through June 30, 1987, GHP accepted all but 11 percent of its individual applicants. Second, it enrolls group subscribers. Any individual who resides in GHP's service area and belongs to a group of at least 100 eligible enrollees may enroll as a group subscriber without completing a health questionnaire. Individual applicants belonging to groups of less than 100 eligible enrollees must usually complete the questionnaire required of individual subscribers, however.

GHP describes itself as "providing health services." In reality, it contracts with other entities in the Geisinger System (at least one of which will contract with physicians from outside the Geisinger System) to provide services to GHP's subscribers. It also contracts with entities such as pharmacies to provide medical and hospital services to its subscribers in exchange for compensation. Under the terms of these contracts, GHP reimburses the hospitals and clinics by paying a negotiated per diem charge for inpatient services and a discounted percentage of billed charges for outpatient services. For the fiscal year ended June 30, 1987, the Clinic and GWV provided 80 percent of all hospital services to GHP subscribers. The remaining 20 percent were provided by other hospitals.

All physician services are provided to GHP subscribers pursuant to a contract between GHP and the Clinic. The contract requires the Clinic to open its emergency rooms to all GHP subscribers, regardless of ability to pay, just as the Clinic's emergency rooms are open to all members of the public, regardless of ability to pay. The Clinic will contract with unaffiliated physicians to provide required services, but for the year ended June 30, 1987, more than 84 percent of the physician services which the Clinic provided to GHP's subscribers were performed by physicians who were employees of the Clinic. GHP compensates the Clinic for the physicians' services by paying a fixed amount per subscriber.

Generally, both GHP's group and individual subscribers are required to pay for hospital services on the basis of a community rating system. This system balances high-risk subscribers against low-risk subscribers. The subscribers must also make copayments for certain goods and services. Individual subscribers pay an additional amount which group subscribers do not pay. This amount covers the additional costs associated with handling individual subscriberships. If a subscriber fails to pay an amount due to GHP or fails to make a required copayment, the subscriber's coverage is terminated upon 30 days written notice, unless payment is made within the 30 days.

GHP has adopted a subsidized dues program which has not yet been implemented. The program would establish a fund comprised of charitable donations and operat-

ing funds to subsidize GHP subscribers who are unable to pay their premiums. The fund would, in GHP's view, "add to the security of [subscribers], any of whom may at some time suffer financial misfortune due to loss of employment, physical or mental disability or other causes beyond their control and which impute no dishonor to the [subscriber]." Appendix at 165. Although the program makes reference to subsidizing people who are already subscribers, GHP's submissions indicate that it also intends to admit people who require subsidization at the time they apply.

Despite GHP's initial projection that it would fund the program by raising $125,-000 in contributions over its first three years of operation, it has been unable to do so, it claims, because potential donors cannot be assured that contributions will be deductible on their federal income tax returns until GHP receives recognition of tax-exempt status under section 501(c)(3). GHP has likewise been unable to support the program with operating funds because it operated at a loss from its inception through the time the record in this case closed.

GHP enrolls some subscribers who are covered by Medicare and Medicaid. As of March 31, 1988, it had enrolled 1,064 Medicare recipients at a reduced rate on a wraparound basis, meaning that it will cover what Medicare does not. It also has enrolled a small number of Medicaid recipients in a few exceptional situations. Generally, however, GHP cannot offer coverage to Medicaid recipients until and unless it contracts with the Pennsylvania Department of Welfare, which administers Pennsylvania's Medicaid program. GHP has negotiated with the Department to obtain such a contract, but efforts to reach agreement have thus far been unsuccessful.

## II.

Shortly after its incorporation, GHP applied to the IRS for recognition of exemption. The Commissioner ruled that GHP was not exempt because (1) it was not operated exclusively for exempt purposes under section 501(c)(3); and (2) it could not vicariously qualify for exemption as an "integral part" of the Geisinger System.

GHP filed suit in Tax Court, requesting a declaratory judgment that it was exempt. The parties submitted the case to the Tax Court on a stipulated administrative record. The Tax Court reversed the Commissioner's ruling in an opinion dated December 30, 1991, which was made final by an order dated February 20, 1992. On May 15, 1992, the Commissioner appealed.

## III.

The first issue is whether GHP, standing alone, is entitled to tax-exempt status under section 501(c)(3). The Code provides in part:

(a) **Exemption from taxation.**—An organization described in subsection (c) ... shall be exempt from taxation....

\* \* \* \* \* \*

[ (c) ](3) Corporations ... organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation ... and which does not participate in, or intervene in ... any political campaign on behalf of (or in opposition to) any candidate for public office.

26 U.S.C. § 501 (Supp.1992). Taxpayers claiming exemption bear the burden of proving entitlement to exemption. *Living Faith, Inc. v. Commissioner,* 950 F.2d 365, 370 (7th Cir.1991) (citing cases).

An organization must be both organized and operated exclusively for a charitable purpose to qualify for exemption under section 501(c)(3). IRS regulations provide:

**(a) Organizational and operational tests.**

(1) In order to be exempt as an organization described in section 501(c)(3), an organization must be both organized and operated exclusively for one or more of the purposes specified in such section.

If an organization fails to meet either the organizational test or the operational test, it is not exempt.

26 C.F.R. § 1.501(c)(3)–1(a).[2]

Organizations desire section 501(c)(3) status because it facilitates fundraising. An organization may qualify as tax-exempt under several sections of the Code. *See* 26 U.S.C. §§ 501(c)(1)–(25). Section 501(c)(3) status, however, carries with it the concomitant benefit of encouraging donors to contribute since such contributions are deductible for purposes of computing their federal income tax and estate and gift tax liability. *Compare* 26 U.S.C. § 170(c) *with* 26 U.S.C. § 501(c). *See Bob Jones University v. United States*, 461 U.S. 574, 577–78 nn. 1 & 2, 587 n. 11, 103 S.Ct. 2017, 2021 nn. 1 & 2, 2026 n. 11, 76 L.Ed.2d 157 (1983).

Generally, "[c]haritable exemptions are justified on the basis that the exempt entity confers a public benefit—a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues." *Bob Jones*, 461 U.S. at 591, 103 S.Ct. at 2028 (footnote omitted). Thus, charitable exemptions from income taxation constitute a *quid pro quo:* the public is willing to relieve an organization from paying income taxes because the organization is providing a benefit to the public.

The parties' dispute flows directly from an application of the second prong of the test set forth in the IRS regulations, the so-called "operational test." This test mandates that, in addition to being organized exclusively for exempt purposes, GHP must be operated exclusively for exempt purposes to qualify for tax-exempt status under section 501(c)(3). *See Presbyterian*, 743 F.2d at 154.

An organization is operated exclusively for exempt purposes "only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." 26 C.F.R. § 1.501(c)(3)–1(c). *See also Better Business Bureau v. United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945) (when construing a similar provision of the Social Security Act, "[t]he presence of a single [non-exempt] purpose, . . . substantial in nature, will destroy the exemption.").

As we stated in *Presbyterian*,

Any exploration of unarticulated or illicit purpose necessarily involves courts in difficult and murky problems. When the legality of an action depends not upon its surface manifestation but upon the undisclosed *motivation* of the actor, similar acts can lead to diametrically opposite legal consequences.

\* \* \* \* \* \*

The difficulties inherent in any legal standard predicated upon the subjective intent of an actor are further compounded when that actor is a corporate entity. . . . In reviewing the decision of the Tax Court . . ., therefore, the question is whether the proper indicia were relied upon in concluding that [the entity applying for exemption] was animated by a purpose alien to the statutory exemption of § 501(c)(3).

*Presbyterian*, 743 F.2d at 155. The only guidance offered in the IRS regulations is found at 26 C.F.R. § 501(c)(3)–1(d)(ii). *Id.* at 156 n. 6. This regulation provides that even if the organization seeking exemption ostensibly serves a charitable purpose, it "is not organized or operated exclusively

---

**2.** While we are not necessarily bound by the IRS regulations or revenue rulings applicable here, neither party has challenged their validity. The IRS merely contends that the Tax Court misapplied the statute and its regulations and rulings. We will, therefore, proceed in accordance with the Supreme Court's admonition that "ever since the inception of the Tax Code, Congress has seen fit to vest in those administering the tax laws very broad authority to inter-

pret those laws. In an area as complex as the tax system, the agency Congress vests with administrative responsibility must be able to exercise its authority to meet changing conditions and new problems. . . . [T]his Court has long recognized the primary authority of the IRS and its predecessors in construing the Internal Revenue Code. . . ." *Bob Jones University v. United States*, 461 U.S. 574, 596, 103 S.Ct. 2017, 2031, 76 L.Ed.2d 157 (1983).

for one or more of the [listed exempt] purposes unless it serves a public rather than a private interest."

GHP argues that it qualifies for exemption because it serves the charitable purpose of promoting health in the communities it serves. There are no published revenue rulings and only one previously litigated case addressing whether an HMO may qualify for exemption under section 501(c)(3). The sole case on this issue is a Tax Court case, *Sound Health Association v. Commissioner*, 71 T.C. 158 (1978), *acq.* 1981-2 C.B. 2.

Thus, we face what is apparently a case of first impression among the United States Courts of Appeals. Under these circumstances, our task necessarily involves both outlining the proper test to be applied in determining whether an HMO may qualify for tax-exempt status and applying that test to the facts at hand.

A. *The Appropriate Test*

In *Sound Health,* the Tax Court applied the law pertaining to nonprofit hospitals as charitable entities in measuring an HMO's claim for exemption. Although this case does not involve a hospital, neither the IRS nor GHP argue that this distinction rendered inappropriate the Tax Court's reliance upon *Sound Health* in examining GHP's request for exemption. To the contrary, in fact, the IRS concedes that GHP's stated purpose, like a hospital's stated purpose, is to promote health; it simply argues that *Sound Health* and the hospital precedents require more than mere promotion of health in order to qualify for tax exemption. The IRS argues that the relevant precedents require at least some "indicia of charity" in the form of serving the public and providing some services free of charge.

While we are not bound by any approach taken by the Tax Court, we find no reason to conclude that the Tax Court erred in applying hospital precedent to its analysis of GHP's exempt status. Accordingly, in light of the parties' and the Tax Court's reliance on the law regarding the tax-exempt status of nonprofit hospitals in formulating the test to be applied to HMOs

seeking exemption under section 501(c)(3), we will measure GHP's tax-exempt status against that standard. In doing so, we recognize that courts are to give weight to IRS revenue rulings but may disregard them if they conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable. *Threlkeld v. Commissioner,* 848 F.2d 81, 84 (6th Cir.1988); *Brook, Inc. v. Commissioner,* 799 F.2d 833, 836 n. 4 (2d Cir.1986); *Strick Corp. v. United States,* 714 F.2d 1194, 1197 (3d Cir.1983); *Carle Foundation v. United States,* 611 F.2d 1192, 1195 (7th Cir.1979). *See supra* note 2.

1. *Nonprofit Hospitals as Tax-Exempt Entities*

Initially, the IRS required that nonprofit hospitals provide some free care in order to qualify for tax exemption under section 501(c)(3). *See* Rev.Rul. 56-185, 1956 C.B. 202. This reflected an early view that hospitals and other health care institutions were only exempt as "charitable" if they both provided relief to the poor and promoted health. *See* Mancino, *Income Tax Exemption of the Contemporary Nonprofit Hospital,* 32 St. Louis U.L.J. 1015, 1038 (1988) (hereinafter "Mancino").

In 1969, however, the IRS modified that requirement and established an alternative "community benefit" standard for hospitals seeking exempt status. Thus, in Rev.Rul. 69-545, the IRS modified Rev.Rul. 56-185 to remove "the requirements relating to caring for patients without charge or at rates below cost." Rev.Rul. 69-545, 1969-2 C.B. 117. It did so in the context of a hospital which provided emergency care to all, regardless of ability to pay.

In Rev.Rul. 69-545, the IRS stated that "the promotion of health is a charitable purpose." Indeed, the word "charitable" is used in its generally accepted legal sense in section 501(c)(3), 26 C.F.R. § 1.501(c)(3)-1(d)(2), and promotion of health has long been considered a charitable purpose under the traditional law of charitable trusts. *See Sound Health,* 71 T.C. at 178; *see generally* Bromberg, *The Charitable Hos-*

*pital*, 20 Cath.U.L.Rev. 237 (1970) (hereinafter "Bromberg").

By issuing Rev.Rul. 69–545, however, the IRS did not abolish entirely the requirement that nonprofit hospitals provide free care. Shortly after it was issued, the United States Court of Appeals for the District of Columbia Circuit held that Rev.Rul. 69–545 did not overrule Rev.Rul. 56–185, but that it

> simply provide[d] an alternative method whereby a nonprofit hospital can qualify as a tax exempt charitable organization. That method entails the operation of an emergency room open to all regardless of their ability to pay and providing hospital services to those able to pay the cost either directly or through third party reimbursement. Thus, to qualify as a tax exempt charitable organization, a hospital must still provide services to indigents.

*Eastern Kentucky Welfare Rights Organization v. Simon*, 506 F.2d 1278, 1289 (D.C.Cir.1974), *vacated on other grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). *See also Sound Health*, 71 T.C. at 181 n. 9.

In 1983, the IRS went a step further, issuing Rev.Rul. 83–157, in which it ruled that a nonprofit hospital need not even maintain an emergency room open to all, regardless of ability to pay, if doing so would result in needless duplication of services in the area. This ruling made clear, however, that other "significant factors" demonstrating that the hospital operated "exclusively to benefit the community" must be present to dispense with the requirement that the hospital need not maintain an open emergency room. Rev.Rul. 83–157, 1983–2 C.B. 94. But the ruling did not provide complete illumination; it did not explain, for example, what was meant

by the word "benefit" or, more importantly for purposes of this appeal, who or what would constitute the "community." There have been no further pronouncements in the form of revenue rulings or regulations.

In sum, no clear test has emerged to apply to nonprofit hospitals seeking tax exemptions. Instead, a nonprofit hospital will qualify for tax-exempt status if it primarily benefits the community. One way to qualify is to provide emergency room services without regard to patients' ability to pay; another is to provide free care to indigents. A hospital may also benefit the community by serving those who pay their bills through public programs such as Medicaid or Medicare. For the most part, however, hospitals must meet a flexible "community benefit" test based upon a variety of indicia.[3]

### 2. HMOs as Tax-Exempt Entities

Overlaid against this background is *Sound Health*. In *Sound Health*, the Tax Court applied the hospital precedents in ruling that an HMO was exempt from taxation.

The *Sound Health* HMO resembled GHP in many ways. Its articles of incorporation listed a number of charitable purposes relating to the promotion of health. Like GHP's subscribers, its subscribers paid for services based upon a community rating system, and a subsidized dues program assisted those who could not afford subscribership. Subscribers also had to satisfy eligibility requirements similar to GHP's. *Sound Health*, 71 T.C. at 168–69, 172–73.

Unlike GHP, however, the *Sound Health* HMO provided health care services itself rather than simply arranging for others to provide them to its subscribers.[4] It also

---

**3.** *See generally* Mancino, 32 St. Louis U.L.J. at 1073; Bromberg, 20 Cath.U.L.Rev. at 248, 257–58 (Rev.Rul. 69–545 set forth an "existential requirement designed to make certain that the charitable hospital does, in fact, benefit the community").

**4.** GHP is, in fact, a different type of HMO than the HMO in *Sound Health*. HMOs had traditionally owned or provided hospital services themselves for a set, prepaid fee. In the late

1970's and early 1980's, however, Individual Practice Association (IPA) HMOs proliferated. "Unlike the traditional group practice or staff model HMOs, IPA-type HMOs do not directly own or provide hospital services. Rather, they arrange for the provision of hospital services by contracting with existing hospitals on a fee for service, capitation, per diem, or other basis." Mancino, 32 St. Louis U.L.J. at 1034. GHP appears to fall within the IPA–HMO category.

employed doctors, health care providers and medical personnel who were not affiliated with the HMO to provide health care to its subscribers. Significantly, the *Sound Health* HMO provided services to both subscribers and members of the general public through an outpatient clinic which it operated and at which it treated all emergency patients, subscribers or not, and regardless of ability to pay. *Id.* at 172. It also adjusted rates for and provided some free care to patients who were not subscribers. It offered public educational programs regarding health.

The court described the IRS' approach to tax exemptions for health care providers, as embodied in the hospital precedents, as reflecting a

> 'community benefit' approach. A charity will benefit the community if the class served is not so small that its relief is not of benefit to the community. This concept has been stated as follows:
>
>> A trust is not a charitable trust if the persons who are to benefit are not of a sufficiently large or indefinite class so that the community is interested in the enforcement of the trust. This is true even though the purpose of the trust is to promote health. . . .
>
> The requirement that the community must benefit from a charity's activities has, as its natural corollary, that private interests must not so benefit in any substantial degree.

*Sound Health*, 71 T.C. at 181, *quoting* 4A Scott, *Scott on Trusts*, § 372.2 at 2897.

The *Sound Health* court went to great lengths to find a benefit to the community rather than simply a benefit to the HMO's subscribers. It rejected the argument that the HMO at issue benefited only its subscribers, finding:

> The most important feature of the Association's [subscribership] form of organization is that the class of persons eligible for [subscribership], and hence eligible to benefit from the Association's activities,

is practically unlimited. The class of possible [subscribers] of the Association is, for all practical purposes, the class of members of the community itself. The major barrier to [subscribership] is lack of money, but a subsidized dues program demonstrates that even this barrier is not intended to be absolute. . . . It is safe to say that the class of persons potentially benefitted [sic] by the Association is not so small that its relief is of no benefit to the community.

*Id.* at 185.

As we have observed, however, the court listed several factors in addition to open subscribership as indications that the *Sound Health* HMO was operated for charitable purposes. Chief among these were the HMO's operation of an emergency room open to all persons, subscribers or not, and regardless of ability to pay; rendering some free care to both subscribers and those who did not subscribe; conducting research; and offering an educational program. *Id.* at 184. GHP refers to these as "marketing techniques," but, as the *Sound Health* court noted, the HMO benefited the community by engaging in these activities.

Thus, the *Sound Health* court did not entirely dispense with the requirement that an entity seeking tax exemption must benefit the community, either by providing services to those who cannot afford to pay or otherwise. *Sound Health* was decided before Rev.Rul. 83–157 was issued, but provision of emergency care was only one of the factors relied upon in holding that the HMO was exempt from taxation under section 501(c)(3). The HMO in *Sound Health* demonstrated that it benefited the community in several ways beyond merely providing emergency services regardless of ability to pay.

### 3. The Resulting Test

■ In administrative proceedings in this case, the IRS contended that GHP had

---

Also in the 1980's, nonprofit hospitals themselves began to form; purchase and contract with alternative delivery systems such as HMOs to vertically integrate and to maintain control

over patient admissions. Mancino, 32 St. Louis U.L.J. at 1035. The Geisinger System's formation of GHP fits perfectly into this pattern.

to meet a strict, fourteen-factor test based upon the facts of *Sound Health* in order to qualify for tax-exempt status. Upon review, we cannot agree that any strict, multi-factor test is appropriate when determining whether an HMO qualifies for tax-exempt status under section 501(c)(3). Rather, the determination must be based upon the totality of the circumstances, with an eye toward discerning whether the HMO in question benefits the community in addition to its subscribers.

### B. *GHP's Status as a Tax–Exempt Entity*

■ Viewed in this light, GHP standing alone does not merit tax-exempt status under section 501(c)(3). GHP cannot say that it provides any health care services itself. Nor does it ensure that people who are not GHP subscribers have access to health care or information about health care. According to the record, it neither conducts research nor offers educational programs, much less educational programs open to the public. It benefits no one but its subscribers.

GHP argues that the *Sound Health* requirement that an HMO seeking exemption must provide an emergency room open to all is rendered obsolete by Rev.Rul. 83–157. This may indeed be the case. Under the logic of Rev.Rul. 83–157, GHP need not provide an emergency room if doing so would unnecessarily duplicate services offered elsewhere in the area. Because the Clinic and other Geisinger System facilities provide emergency care to GHP's subscribers, requiring GHP to operate an emergency room may be unnecessarily duplicative and wasteful.

This conclusion would not, however, automatically bestow upon GHP an entitlement to tax-exempt status. The test remains one of community benefit, and GHP cannot demonstrate that it benefits anyone but its subscribers.

It is true that GHP is open to anyone who can afford to pay and that, like the HMO in *Sound Health*, GHP apparently intends to lower, or even to remove, this potential economic barrier to subscribing through its subsidized dues program. As we explain below, however, the mere presence of the subsidized dues program does not necessarily invite a conclusion that GHP benefits the community.

■ First, the *Sound Health* court ventured too far when it reasoned that the presence of a subsidized dues program meant that the HMO in question served a large enough class that it benefited the community. The court ruled that because there was no economic barrier to subscribership, "the class of persons potentially benefitted [sic] by the Association is not so small that its relief is of no benefit to the community." *Sound Health,* 71 T.C. at 185. In doing so, however, the court misconstrued the relevant inquiry by focusing on whether the HMO benefited the community at all rather than whether it primarily benefited the community, as an entity must in order to qualify for tax-exempt status.

The mere fact that a person need not pay to belong does not necessarily mean that GHP, which provides services only to those who do belong, serves a public purpose which primarily benefits the community. The community benefited is, in fact, limited to those who belong to GHP since the requirement of subscribership remains a condition precedent to any service. Absent any additional indicia of a charitable purpose, this self-imposed precondition suggests that GHP is primarily benefiting itself (and, perhaps, secondarily benefiting the community) by promoting subscribership throughout the areas it serves.

There may be circumstances in which an HMO will be able to demonstrate that the purpose of self-promotion is not so "substantial in nature" that it should not be accorded section 501(c)(3) status, even though access to service is premised upon membership. *See Better Business Bureau,* 326 U.S. at 283, 66 S.Ct. at 114. *Cf. Presbyterian,* 743 F.2d at 155 (when legality of an action depends on the actor's motivation, "similar acts can lead to diametrically opposite legal consequences"). In this case, however, self-promotion appears to be the primary purpose for requiring membership. We are unaware of, and

GHP has not identified, evidence which would lead to any other conclusion. Under these circumstances, we conclude that the presence of a subsidized dues program does not, in and of itself, primarily benefit the community sufficiently to enable GHP to qualify for tax-exempt status.

Second, the *Sound Health* court need not have gone as far as it did. The presence of a subsidized dues program was not the only factor it considered when deciding that the HMO in question qualified for tax-exempt status. For example, the HMO in *Sound Health* "in effect, [ran] a substantial outpatient clinic as an important ingredient of its medical care services." *Id.* It also provided free care even to persons who did not subscribe and offered educational programs to the public.

Finally, even considering the subsidized dues program, the amount of benefit GHP intends to confer on people other than paying subscribers is minuscule. GHP anticipates subsidizing approximately 35 people. We cannot say that GHP operates primarily to benefit the community at large rather than its subscribers by arranging for health care for only 35 people, who would not otherwise belong, as compared to more than 70,000 paying subscribers. GHP argues that the HMO in *Sound Health* had provided only $158.50 in subsidies when it was granted tax-exempt status. This is true, but, as previously noted, the HMO in that case also benefited the community in other ways, most notably by providing free or reduced-cost care to people who were not subscribers. An HMO must primarily benefit the community, not its subscribers plus a few people, in order to qualify for tax-exempt status under section 501(c)(3).

In sum, GHP does not qualify for tax-exempt status under section 501(c)(3) since it does no more than arrange for its subscribers, many of whom are medically underserved, to receive health care services from health care providers. This is so even though it has a program designed to subsidize the subscribership of those who might not be able to afford the fees required of all other subscribers. Arranging for the provision of medical services only to those who "belong" is not necessarily charitable, particularly where, as here, the HMO has arranged to subsidize only a small number of such persons. GHP, standing alone, is not entitled to tax-exempt status under section 501(c)(3).

## IV.

■ Alternatively, GHP argues that it is entitled to tax-exempt status under section 501(c)(3) because it is an integral part of the Geisinger System. The integral part doctrine provides a means by which organizations may qualify for exemption vicariously through related organizations, as long as they are engaged in activities which would be exempt if the related organizations engaged in them, and as long as those activities are furthering the exempt purposes of the related organizations. *Texas Learning Technology Group v. Commissioner,* 958 F.2d 122, 126 (5th Cir. 1992). The integral part doctrine has been applied in the context of several Code sections. *See, e.g., Squire v. Students Book Corp.,* 191 F.2d 1018 (9th Cir.1951); *Brundage v. Commissioner,* 54 T.C. 1468 (1970), *acq.* 1970–2 C.B. xix; Rev.Rul. 81–19, 1981–1 C.B. 30; Rev.Rul. 75–282, 1975–2 C.B. 201.

■ We decline to address the merits of the integral part doctrine at this stage, and instead remand the question of its application to this case to the Tax Court for clarification. *Cf. Garden State Bar Association v. Middlesex County Ethics Committee,* 687 F.2d 801, 802–03 (3d Cir.1982). It is possible that the Tax Court, in ruling that GHP was entitled to exemption under section 501(c)(3), silently intermingled the roles played by GHP and other entities in the Geisinger System, thus effectively grounding its decision in the integral part doctrine. Its recitation of a great many facts regarding other entities in the Geisinger System suggests that it may have done just that. If that is the case, the Tax Court is in the best position to clarify this matter on remand.

## V.

In conclusion, we will reverse the Tax Court's decision that GHP, standing alone, qualifies for tax-exempt status under 26 U.S.C. § 501(c)(3) because GHP does not demonstrate the community benefit required to satisfy the operational test. We will, however, remand this case to the Tax Court for a determination of whether GHP qualifies for tax-exempt status under section 501(c)(3) because it is an integral part of the Geisinger System.