T.C. Memo. 2001-248

UNITED STATES TAX COURT

IHC CARE, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14601-99X.          Filed September 19, 2001.

Douglas M. Mancino, James L. Malone III, and Robert C.
Louthian III, for petitioner.

Mark A. Weiner, Kirk M. Paxson, Don R. Spellman, and Kenneth
M. Griffin, for respondent.

MEMORANDUM OPINION

WELLS, Chief Judge:  In a final adverse determination
letter, respondent determined that IHC Care, Inc. (petitioner),
did not qualify as an organization described in sections
501(c)(3) and 170(c)(2) and was not entitled to exemption from
Federal income tax pursuant to section 501(a).  Unless otherwise

indicated, section references are to sections of the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure. Petitioner filed a timely petition for declaratory judgment pursuant to section 7428(a) challenging respondent's determination letter. At the time the petition was filed, petitioner's principal place of business was in Salt Lake City, Utah.

The administrative record was submitted to the Court pursuant to Rule 217(b)(1). The facts contained in the administrative record are assumed to be true for purposes of this proceeding. See Rule 217(b)(1). The case was submitted to the Court by joint motion of the parties pursuant to Rule 122. The parties agree that petitioner has satisfied all jurisdictional requirements. See sec. 7428(b); Rule 210(c).

## Background

By way of a brief introduction, petitioner, along with its sister corporation IHC Group, Inc. (Group), and their common parent, IHC Health Plans, Inc. (Health Plans), operated health maintenance organizations and were part of a number of companies comprising the so-called Intermountain Health System. Petitioner offered health plans to the employees of employers with more than 100 employees. At the same time that respondent denied petitioner's application for tax-exempt status, respondent denied Group's application for tax-exempt status and revoked Health

Plans' tax-exempt status.[1]  For completeness, we have provided a detailed description of the various entities comprising the Intermountain Health System.

I.  The Intermountain Health System

A.  Intermountain Health Care, Inc.

Between 1882 and 1970, the Church of Jesus Christ of Latter-Day Saints (LDS Church) constructed or purchased 15 hospitals in the States of Utah, Idaho, and Wyoming.  During 1970, LDS Church organized Intermountain Health Care, Inc. (IHC), as a nonprofit corporation under the laws of the State of Utah.  LDS Church organized IHC for the purpose of assuming ownership and control of LDS Church hospitals.  During 1975, LDS Church relinquished control of IHC.  Respondent recognized IHC as an organization described in section 501(c)(3) that is exempt from taxation pursuant to section 501(a).

Over a period of several years, IHC organized a group of affiliate corporations for the purpose of forming a comprehensive health care network with operations in Utah and surrounding states.

B.  IHC Health Services, Inc.

During 1983, IHC organized a nonprofit affiliate, IHC Health

---

[1]  Respondent's determinations to deny IHC Group, Inc.'s application for tax-exempt status and to revoke IHC Health Plans, Inc.'s tax-exempt status are the subjects of the Court's opinions in IHC Group, Inc. v. Commissioner, T.C. Memo. 2001-247 and IHC Health Plans, Inc. v. Commissioner, T.C. Memo. 2001-246.

Services, Inc. (Health Services).  IHC transferred substantially all of its assets, including its hospital properties, and substantially all of its liabilities, to Health Services. Respondent recognized Health Services as an organization described in section 501(c)(3) that is exempt from taxation pursuant to section 501(a).

Health Services conducted its activities through two divisions, the hospital division and the physician division, which are described in detail below.

1.  The Hospital Division

Health Services' hospital division comprised 23 hospitals (including 2,644 licensed beds) located in Utah and Idaho.  All Health Services hospitals, with the exception of Primary Children's Medical Center (Primary Children's) and McKay-Dee Institute for Behavioral Medicine (McKay-Dee Institute), were general acute care hospitals that provided inpatient and outpatient services, and varying levels of emergency, ancillary, and specialized services.  The scope of services varied with the size of the hospital and the needs of the particular community. All Health Services hospitals participated in the Medicare and Medicaid programs for inpatient and outpatient hospital services, and for a number of free-standing ambulatory care services such as ambulatory surgery, home health care, and kidney dialysis.

Primary Children's specialized in pediatric care in the Intermountain West (defined generally as the area covering eastern Nevada, western Colorado, and the States of Utah, Idaho, Wyoming, and Montana). The McKay-Dee Institute operated a free-standing psychiatric and behavioral health facility located in Ogden, Utah.

During 1998, Health Services provided $42 million worth of charity services to indigent patients.

2. The Physician Division

As of December 31, 1998, Health Services' physician division employed 245 primary care physicians (general internists, family practitioners, and pediatricians) and 215 specialist physicians. The physicians generally practiced in Health Services' clinics and other community-based settings.

C. IHC Health Plans, Inc.

During 1983, IHC organized Health Plans as a nonprofit affiliate for the purpose of establishing a State-licensed health

maintenance organization (HMO)[2].  IHC was Health Plans' sole corporate member.

Health Plans was licensed to operate an HMO in the State of Utah and was permitted to offer a variety of health plans to individuals and employers in the communities that it served. Health Plans did not own any medical facilities or employ any physicians.  Health Plans offered its plans to:  (1) Individuals and their families; (2) the employees of both large and small employers; and (3) individuals covered by Medicaid.  Health Plans operated the largest HMO within the IHC system and the State of Utah.  In June 1985, respondent recognized Health Plans as an organization described in section 501(c)(3) that is exempt from taxation pursuant to section 501(a).

---

[2]    Utah Code Ann. sec. 31A-8-101(5) (1999 Repl.) defines the term "Health maintenance organization" (HMO) as follows:

> (5) "Health maintenance organization" means any person, other than an insurer licensed under Chapter 7 or an individual who contracts to render professional or personal services that he performs himself, which:
>
> > (a) furnishes at a minimum, either directly or through arrangement with others, basic health care services to an enrollee in return for prepaid periodic payments agreed to in amount prior to the time during which the health care may be furnished; and
> >
> > (b) is obligated to the enrollee to arrange for or to directly provide available and accessible health care.

D.  Federally-Qualified HMOs[3]

---

[3]  HMOs are defined for purposes of Federal law under 42 U.S.C. sec. 300e(a) (1994) which provides:

(a) "Health maintenance organization" defined

For purposes of this subchapter, the term "health maintenance organization" means a public or private entity which is organized under the laws of any State and which (1) provides basic and supplemental health services to its members in the manner prescribed by subsection (b) of this section, and (2) is organized and operated in the manner prescribed by subsection (c) of this section.

42 U.S.C. sec. 300e(b)(1) (1994) provides in pertinent part that an HMO generally will provide basic health services to its members without limitations as to time or cost for a fixed payment from each member that is determined under a community rating system and is paid on a periodic basis without regard to the dates health services are provided.  42 U.S.C. sec. 300e(b)(2) (1994) provides that HMOs may also provide members with supplemental health services (defined in 42 U.S.C. sec. 300e-1(2) (1994)) for a separate fee that is fixed under a community rating system.

42 U.S.C. sec. 300e(b)(3)(A) (1994) provides that at least 90 percent of physician services provided as basic health services to an HMO enrollee shall be provided through:  (1) the members of the HMO's physician staff (staff model HMO); (2) a medical group (medical group model HMO); (3) an individual practice association (IPA model HMO); (4) physicians who have contracted with the HMO for the provision of such services (direct contract model HMO), or (5) any combination of these models.  See Health Care Plan, Inc. v. Aetna Life Ins. Co., 966 F.2d 738, 739 n.3 (2d Cir. 1992); 42 C.F.R. sec. 417.100 (1991) (definitions); Boisture, Assessing The Impact Of Health Care Reform On The Formation Of Tax-Exempt Health Care Providers And HMO's, 62 Tax Notes 1181, 1184 (Feb. 28, 1994).

42 U.S.C. sec. 300e(c)(1) (1994) provides that HMOs shall have a fiscally sound operation, adequate provision against the risk of insolvency, and assume full financial risk on a prospective basis for the provision of basic health services. However, 42 U.S.C. sec. 300e(c)(2) (1994) provides that HMOs may

(continued...)

1.  <u>IHC Care, Inc.</u>

In January 1985, Health Plans organized petitioner as a
nonprofit affiliate for the purpose of establishing a federally
qualified direct contract model HMO.[4]  Health Plans was
petitioner's sole corporate member.  Petitioner's articles of
incorporation stated that petitioner

> is organized and shall be operated exclusively for
> charitable, educational, or scientific purposes as
> described in section 501(c)(3) * * *.
>
> In furtherance of such purposes, the Corporation
> may develop and operate alternative health care
> delivery plans and financing systems such as a health
> maintenance organization to provide cost-effective and

---

[3](...continued)
obtain insurance:  (1) For the cost of providing a member with
more than $5,000 in basic health services for any one year; (2)
for the cost of basic health services provided to a member by a
source outside the HMO due to an emergency; and (3) for not more
than 90 percent of the amount by which its costs for any fiscal
year exceeds 115 percent of its income.  Additionally, the
section states that HMOs may enter into arrangements under which
physicians and/or health care institutions assume all or part of
the risk on a prospective basis for the provision to enrollees of
basic health services.

[4]     The Health Maintenance Organization Act of 1973 (the HMO
Act), Pub. L. 93-222, 87 Stat. 914, codified a number of
provisions governing the organization and operation of federally
qualified HMOs. Under the HMO Act, an HMO was required to satisfy
both State licensing requirements and additional federally
mandated conditions pertaining to benefits, availability and
accessibility of services, fiscal soundness, and quality
assurance.  The HMO Act provided federally qualified HMOs with
certain marketing advantages.  In particular, under 42 U.S.C.
sec. 300e-9 (1976), a provision referred to as the so-called
dual-choice mandate, certain employers (generally those with more
than 25 employees) were obligated to offer their employees the
option of enrolling in a federally qualified HMO.

high quality care to members of the community, including elderly and disadvantaged persons, and it may conduct research and educational demonstration projects with various health care delivery systems.

Petitioner was licensed to operate an HMO in the State of Utah and was subject to regulation by the Utah Insurance Commissioner. Petitioner used the same network of health care providers used by Health Plans.

2. IHC Group, Inc.

In July 1991, Health Plans organized Group as a nonprofit affiliate for the purpose of establishing a federally qualified medical group model HMO.[5] Health Plans was Group's sole corporate member.

Group was licensed to operate an HMO in the State of Utah and was subject to regulation by the Utah Insurance Commissioner.

IHC had effective control of Health Plans, petitioner, and Group by virtue of its authority (direct and indirect) to elect their boards of trustees. Health Plans, petitioner, and Group shared the same officers and trustees.

II. Petitioner's Operations

Health Plans structured its health plans in conjunction with

---

[5] Group was considered a closed panel, medical group model HMO because Group contracted for physician services with physician medical groups and required its enrollees to agree to coordinate all of their medical care through a primary care physician (PCP) or so-called gatekeeper. In cases in which the PCP determined that an enrollee should be seen by a medical specialist, the PCP generally was expected to refer the enrollee to a specialist within the PCP's medical group.

petitioner's and Group's health plans in order to offer potential enrollees a range of health services and pricing options. Health Plans provided general and administrative services to petitioner and Group including marketing, sales, enrollment, customer service, claims processing, underwriting and actuarial services, provider relations and contracting, management information systems, and general accounting services.

Petitioner operated as an open panel, direct contract model HMO offering health plans known as IHC Care and IHC Senior Care. In short, as petitioner did not itself provide health care services, it arranged for its enrollees to receive such services by contracting directly with individual physicians (rather than a physician medical group) to provide health services to its enrollees.

A.   IHC Care Health Plan

Petitioner offered its IHC Care health plan solely to employers with more than 100 employees.[6] Petitioner collected premiums from its enrollees and arranged for them to receive comprehensive health care services, including preventive care, outpatient services, inpatient hospital services, emergency

---

[6]   Health Plans also offered a plan known as IHC Care. The principal differences between petitioner's IHC Care plan and the IHC Care plan offered by Health Plans related to the methodology applied in determining premiums and the enrollees' degree of access to primary care physicians. See IHC Health Plans, Inc. v. Commissioner, T.C. Memo. 2001-246.

services, out-of-area services, and miscellaneous services such as ambulance and pharmacy services.

To participate in petitioner's IHC Care health plan, an employer was required to enter into a master group contract. Thereafter, during annual open enrollment periods, the employer's individual employees were permitted to enroll in the health plan and select the benefit package of his or her choice. Although petitioner did not deny membership to enrollees with preexisting medical conditions, petitioner denied full coverage for certain preexisting conditions during the first 12 months of membership.

Petitioner did not own or operate any medical facilities, nor did it directly employ any physicians or other health care professionals. Petitioner fulfilled its obligation to arrange for its IHC Care enrollees to receive physician services by contracting with a panel of 1,165 primary care physicians and specialist physicians to provide such services. Approximately 83 percent of these physicians were independent physicians while the remaining 17 percent of the physician panel was composed of physicians employed by Health Services. Petitioner required all such physicians to have staff privileges at one of Health Services' hospitals.

Petitioner relied upon an adjusted community rating methodology to determine IHC Care premiums.[7]  Petitioner's rating methodology included adjustments for actual enrollee utilization rates during the preceding year and a projection of the cost of services expected to be provided during the coverage period. Petitioner's premium formula also took into account the following factors:  Age and sex, family size, industry, group effective date, and benefit variations among different employer groups.

Petitioner generally compensated independent primary care and specialist physicians on a discounted fee-for-service basis. The fee for each service was equal to the lesser of the physician's current prevailing fee or a maximum allowable fee schedule.  Petitioner developed the maximum allowable fee schedule based on its own studies of usual and customary charges and an analysis of available market data.

Petitioner compensated Health Services for the services of its primary care and specialist physicians using various methodologies including capitation and discounted fee-for-service.  Under its capitation methodology, petitioner paid Health Services a fixed monthly fee for each enrollee under the care of Health Services' physicians.

---

[7]    See 42 C.F.R. sec. 417.104(b) (1991), which sets forth the requirements for acceptable HMO community rating systems.

Petitioner determined that, from 1985 to April 1994, its fee schedule produced payments to primary care physicians that were 20 percent below mid-market rates.  For all physician services, petitioner calculated that its fee schedule represented a discount (relative to the amount billed) of approximately 14 percent in 1993, 20 percent in 1994, 28 percent in 1995, and 33 percent in 1996.

Between 1985 and 1995, petitioner withheld between 10 and 20 percent of its payments to physicians, unless the physicians achieved certain budgetary savings.  In 1996, petitioner discontinued withholding payments to physicians.

Prior to April 1996, petitioner made incentive payments to physicians who controlled expenses and reduced the cost of providing health care services to petitioner's enrollees. Eligible physicians received incentive payments for years in which petitioner's actual health care costs were less than its projected costs.

Approximately 21 percent of petitioner's expenditures for physician services was attributable to services provided by physicians employed by Health Services.  The remaining 79 percent of such expenditures was attributable to services provided by independent physicians.

Petitioner fulfilled its obligation to arrange for its enrollees to receive hospital services by contracting with a

panel of hospitals including Health Services hospitals and a limited number of independent hospitals.  Petitioner generally compensated its contractor hospitals pursuant to a modified diagnosis related group (DRG) payment system under which an enrollee admitted to a hospital on either an inpatient or outpatient basis would be assigned a DRG and the hospital would be paid a fixed fee consistent with the DRG schedule.

Approximately 90 percent of petitioner's expenditures for inpatient hospital services and approximately 91 percent of petitioner's expenditures for outpatient hospital services were attributable to services provided by Health Services hospitals.

A substantial portion of petitioner's enrollees' admissions to independent hospitals were for admissions to either University of Utah Medical Center (UMC) or Davis Hospital and Medical Center.  In particular, Health Services entered into special contracts with UMC to obtain services from UMC's:  (1) Intermountain Burn Center (the only certified burn center in the region); (2) Neuropsychiatric Institute (to provide psychiatric beds when LDS Hospital temporarily exceeded its inpatient capacity); and (3) Pain Management Center.  Some UMC admissions were related to a unique relationship between Primary Children's Hospital, a Health Services hospital dedicated to acute care pediatric services, and UMC's specialized genetic research and other pediatric-related teaching and research programs.  In

addition, Health Plans, petitioner, and Group entered into provider agreements with Davis Hospital and Medical Center, located in Davis County, Utah, because there were no Health Services hospitals in the immediate area.

During the 2-year period including 1997 and 1998, UMC accounted for approximately 50 percent of all inpatient hospital services provided to petitioner's enrollees by independent Utah hospitals.  During the 2-year period including 1997 and 1998, UMC accounted for approximately 42 percent of all outpatient hospital services provided to petitioner's enrollees by independent Utah hospitals.

Petitioner maintained a Core Wellness Program under which its enrollees were provided health care information and a variety of health care services at no additional charge.  Petitioner's Core Wellness Program included annual worksite health screenings, group health risk profiles, a 24-hour nurse hotline, ergonomics assessment and consulting, worksite health seminars, and a health newsletter.  Petitioner did not offer its Core Wellness Program to the general public.

B.  IHC Senior Care Health Plan

Between 1996 and 1998, petitioner offered a Medicare "risk" health plan known as IHC Senior Care (Senior Care plan).  Under petitioner's Senior Care plan, Medicare eligible enrollees agreed to obtain their Medicare Part A (hospital services) and Medicare

Part B (physician services) from petitioner's network of providers, and petitioner was compensated by the Government for each enrollee on a pre-paid, capitation basis.  Between 1993 and 1998, Group offered a Medicare "cost" health plan of the same name.[8]

Petitioner and Group ceased offering their respective Senior Care plans effective December 31, 1998.  Petitioner terminated its Senior Care plan in part due to the financial losses that it incurred under the program.

C.  Enrollment

As of September 30, 1997, petitioner had 22,258 enrollees, including 15,006 enrollees in IHC Care and 7,252 enrollees in IHC Senior Care.

D.  Lack Of Free/Low Cost Services

Petitioner did not provide any charity care.  Petitioner did not maintain a program designed to encourage or assist low income persons, medically high-risk persons, persons located in medically under-served areas, or elderly persons to enroll in its

---

[8]     Under Group's Senior Care plan, Medicare eligible enrollees who paid the required premium were entitled to obtain physician services (and a number of additional services not covered by Medicare) from petitioner's panel of primary care physicians and specialists and were relieved of the obligation to pay any deductible or co-insurance payments under Medicare Part B (physician services).  Enrollees in Group's Senior Care plan retained their eligibility for Medicare Part A (hospital services) and continued to pay Medicare Part A premiums to the Government.

health plans.  Petitioner did not subsidize premiums for persons who were unable to afford its premiums, and petitioner did not retain existing enrollees who failed to pay their premiums. Petitioner did not conduct any medical, health care, or scientific research.

III.  <u>Petitioner's Application for Exemption</u>

In 1986, petitioner filed with respondent an application for recognition as an organization described in section 501(c)(3) that is exempt from taxation pursuant to section 501(a). Petitioner's application stated that it intended to operate for the charitable purpose of promoting health for the benefit of the community.

On October 29, 1998, respondent issued a final adverse determination letter to petitioner denying its application for tax-exempt status pursuant to section 501(c)(4).  The record does not reflect the date that petitioner filed its application for exemption under section 501(c)(4) or whether petitioner filed a petition for declaratory judgment with the Court challenging respondent's determination under section 501(c)(4).

On June 16, 1999, respondent issued a final adverse determination letter to petitioner denying its application for tax-exempt status pursuant to section 501(c)(3).  Respondent determined that petitioner did not qualify as an organization described in section 501(c)(3) on the ground that petitioner was

not operated exclusively for an exempt purpose.  In the alternative, respondent determined that, even assuming that petitioner qualified as an organization described in section 501(c)(3), petitioner was not entitled to tax-exempt status because a substantial part of its activities consisted of providing commercial type insurance within the meaning of section 501(m).

On June 16, 1999, respondent also denied Group's application for tax-exempt status.  On July 21, 1999, respondent issued a revocation letter to Health Plans revoking its status as an organization described in section 501(c)(3).

## Discussion

## Section 501(c)(3)

To qualify as an organization described in section 501(c)(3) that is exempt from Federal income taxation pursuant to section 501(a), an organization generally must demonstrate:  (1) It is organized and operated exclusively for certain specified exempt purposes; (2) no part of its net earnings inures to the benefit of a private shareholder or individual; (3) no part of its activities constitutes intervention or participation in any political campaign on behalf of any candidate for public office; and (4) no substantial part of its activities consists of political or lobbying activities.  See Fla. Hosp. Trust Fund v. Commissioner, 103 T.C. 140, 145 (1994), affd. 71 F.3d 808 (11th

Cir. 1996); Am. Campaign Acad. v. Commissioner, 92 T.C. 1053, 1062 (1989).

Qualification as an organization described in section 501(c)(3) not only provides an exemption from Federal income taxes, but also generally permits the organization to solicit and accept donations which normally are deductible by the donor against his or her Federal taxes.  See sec. 170(c); Bob Jones Univ. v. United States, 461 U.S. 574, 577-578 (1983).  With a few minor differences, the organizations and requirements listed in section 170(c)(2) are virtually identical to those described in section 501(c)(3).  With limited exceptions not here relevant, organizations described in the other paragraphs of section 501(c) are not eligible to receive tax-deductible contributions.

In the event the Commissioner determines that an organization does not qualify for tax-exempt status, the organization may (after exhausting its administrative remedies) seek judicial review of the matter.  Section 7428(a) confers jurisdiction on the Tax Court, among other courts, to make a declaration with respect to the initial or continuing qualification of an organization as an organization described in section 501(c)(3).  See Houston Lawyer Referral Serv., Inc. v. Commissioner, 69 T.C. 570, 571 (1978).

It is well established that the scope of our inquiry is limited to the propriety of the reasons given by the Commissioner

- 20 -

for denying an organization's application for exemption.  See <u>Aid to Artisans, Inc. v. Commissioner</u>, 71 T.C. 202, 208 (1978).  Thus, in making our declaration, we do not engage in a de novo review of the administrative record.  See <u>Am. Campaign Acad. v. Commissioner</u>, <u>supra</u> at 1063; <u>Church in Boston v. Commissioner</u>, 71 T.C. 102, 105-106 (1978); <u>Houston Lawyer Referral Serv., Inc. v. Commissioner</u>, <u>supra</u> at 573-574, 577.  The burden of proof is on the organization to overcome the grounds for denial of the exemption set forth in the Commissioner's determination.  See Rule 217(c)(4)(A); <u>Fla. Hosp. Trust Fund v. Commissioner</u>, <u>supra</u> at 146; <u>Christian Manner Intl., Inc. v. Commissioner</u>, 71 T.C. 661, 664-665 (1979); <u>Hancock Acad. of Savannah, Inc. v. Commissioner</u>, 69 T.C. 488, 492 (1977).

The parties do not dispute that petitioner was organized for an exempt purpose within the meaning of section 501(c)(3).  The dispute in this case centers on whether petitioner was operated exclusively for an exempt purpose.

Section 1.501(c)(3)-1(c)(1), Income Tax Regs., provides:

> (c) Operational test--(1) Primary activities.  An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3).  An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

The operational test focuses on the actual purposes the organization advances by means of its activities, rather than on

the organization's statement of purpose or the nature of its activities.  See Am. Campaign Acad. v. Commissioner, supra at 1064; Aid to Artisans, Inc. v. Commissioner, supra at 210-211.  Although an organization might be engaged in only a single activity, that single activity might be directed toward multiple purposes, both exempt and nonexempt.  See Redlands Surgical Servs. v. Commissioner, 113 T.C. 47, 72 (1999), affd. per curiam 242 F.3d 904 (9th Cir. 2001).  "[T]he presence of a single * * * [non-exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes."  Better Bus. Bureau, Inc. v. United States, 326 U.S. 279, 283 (1945); see Manning Association v. Commissioner, 93 T.C. 596, 603-605 (1989); Am. Campaign Acad. v. Commissioner, supra at 1065.

Whether an organization operates for a substantial nonexempt purpose is a question of fact to be resolved on the basis of all the evidence presented in the administrative record.  See Church By Mail, Inc. v. Commissioner, 765 F.2d 1387, 1390 (9th Cir. 1985), affg. T.C. Memo. 1984-349.  For purposes of the instant proceeding, we assume that the facts as represented in the administrative record are true, although in the course of our review we may draw our own ultimate conclusions and inferences from the facts.  See Am. Campaign Acad. v. Commissioner, supra at 1063-1064; Houston Lawyer Referral Serv., Inc. v. Commissioner,

supra at 573-575 (1978).

Section 501(c)(3) specifies various qualifying exempt purposes, including "charitable" purposes. The term "charitable" is not defined in section 501(c)(3) but is used in its generally accepted legal sense. See Nationalist Movement v. Commissioner, 102 T.C. 558 (1994), affd. per curiam 37 F.3d 216 (5th Cir. 1994); sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.

Charitable Purpose

The Supreme Court has stated that "Charitable exemptions are justified on the basis that the exempt entity confers a public benefit--a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues." Bob Jones Univ. v. United States, supra at 591. Although neither the furnishing of medical care nor the operation of an HMO is listed as a qualifying exempt activity under section 501(c)(3), it is now well settled that the promotion of health for the benefit of the community is a charitable purpose. See Redlands Surgical Servs. v. Commissioner, supra at 73; Sound Health Association v. Commissioner, supra at 177-181. As discussed in detail below, a health-care provider seeking tax-

exempt status, such as an HMO, must demonstrate that it provides a community benefit.

Community Benefit Test

In Sound Health Association v. Commissioner, supra, we first considered whether an HMO may qualify as an organization described in section 501(c)(3). The Commissioner determined that Sound Health Association did not qualify for tax-exempt status pursuant to section 501(c)(3) on the ground that the organization served the private interests of its members as opposed to the interests of the community.

In Sound Health Association v. Commissioner, supra at 182-183, we utilized the same factors deemed significant by the Commissioner in granting tax-exempt status to one of two hospitals under review in Rev. Rul. 69-545, 1969-2 C.B. 117, and referred to the factors cited favorably in that ruling as the community benefit test. In Sound Health Association, we concluded that the subject organization shared several characteristics with the hospital deemed exempt in Rev. Rul. 69-545, supra. In particular, like the hospital in the revenue ruling, Sound Health Association operated a medical clinic and employed physicians and nurses to provide medical services, and opened its emergency room to all persons requiring emergency care whether they were members or not and regardless of whether they were financially able to pay. Sound Health Association also

established a research program to study health care delivery systems, conducted a health education program open to the general public, and was governed by a board of directors the majority of whom were elected by Sound Health Association members from the community at large. Sound Health Association v. Commissioner, supra at 184.

We found that Sound Heath Association provided community benefits beyond those offered by the hospital deemed exempt in Rev. Rul. 69-545, supra. Specifically, Sound Health Association adopted a plan to accept contributions for the purpose of subsidizing membership for those who could not otherwise afford to pay the full amount of monthly dues. Further, Sound Health Association's practice of offering membership to the public at large demonstrated that the class of persons eligible to benefit from the organization's activities was practically unlimited. Sound Health Association v. Commissioner, supra at 184-185.

We rejected the Commissioner's argument that Sound Health Association provided an unwarranted private benefit to its members. We reasoned that, like the hospital deemed exempt in Rev. Rul. 69-545, supra, which (except in emergency cases) limited its treatment to paying patients, Sound Health Association was permitted to restrict its services to paying members. Sound Health Association v. Commissioner, supra at 186-187.

The tax-exempt status of an HMO arose again in <u>Geisinger Health Plan v. Commissioner</u>, T.C. Memo. 1991-649 (Geisinger I), revd. and remanded 985 F.2d 1210 (3d Cir. 1993) (Geisinger II), opinion on remand 100 T.C. 394 (1993) (Geisinger III), affd. 30 F.3d 494 (3d Cir. 1994) (Geisinger IV).  Geisinger HMO, like petitioner in the instant case, was part of a group of related organizations forming a large health care network (the Geisinger system).

Geisinger HMO arranged for its enrollees to receive hospital services by contracting for such services with other Geisinger entities (Geisinger hospitals and outpatient clinics that were recognized as exempt organizations) and independent hospitals. Geisinger HMO arranged for its enrollees to receive physician services by contracting for such services with Clinic--a tax-exempt Geisinger affiliate.  Clinic provided physician services through a combination of 400 staff physicians and by contracting with independent physicians for their services.  Geisinger HMO was organized as a separate entity to avoid regulatory difficulties and to simplify operations from an organizational and managerial standpoint.

Geisinger HMO offered enrollment to groups (with a minimum of 100 eligible enrollees) and individuals (and certain dependents) residing in 17 of the 27 counties in which the Geisinger system operated.  Individual enrollees were required to

be at least 18 years of age. Individual enrollees were required to complete a medical questionnaire, whereas group enrollees were not subject to this requirement. All enrollees generally paid the same premium based on a community rating system. During the period in question, Geisinger HMO had approximately 71,000 individual and group enrollees.

Geisinger HMO also enrolled slightly more than 1,000 Medicare recipients under a "wraparound" plan that covered medical expenses not reimbursed by Medicare. Geisinger HMO also enrolled a small number of Medicaid recipients. Geisinger HMO planned to initiate a subsidized dues program to assist enrollees who might be unable to continue to pay their membership fees as the result of some financial misfortune.

At the conclusion of the administrative proceedings, the Commissioner determined that Geisinger HMO did not qualify for exemption as an organization described in section 501(c)(3) on the grounds: (1) Geisinger HMO did not satisfy the criteria for exemption outlined in Sound Health Association v. Commissioner, supra; and (2) Geisinger HMO was not an integral part of its tax-exempt parent.

In Geisinger I, we held that the Commissioner erred in determining that Geisinger HMO did not qualify for exemption pursuant to section 501(c)(3). We based our holding largely on a comparison of the Geisinger HMO with the organization in Sound

Health Association v. Commissioner, 71 T.C. 158 (1978). In particular, we found that, like Sound Health Association, Geisinger HMO was operated for the charitable purpose of promoting health insofar as its class of possible enrollees was practically unlimited, it had adopted a subsidized dues program for its enrollees, it offered health care services to Medicare recipients at a reduced rate, and it was not operated for the private benefit of its enrollees. Geisinger Health Plan v. Commissioner, T.C. Memo. 1991-649.

In Geisinger II, the United States Court of Appeals for the Third Circuit reversed and remanded our decision in Geisinger I. Geisinger Health Plan v. Commissioner, 985 F.2d at 1218-1219. Although the Court of Appeals agreed with the Court that an HMO seeking tax-exempt status must provide a community benefit, see id., the Court of Appeals concluded that Geisinger HMO did not provide a primary benefit to the community but, rather, provided benefits solely to its members. The Court of Appeals, looking at the totality of the circumstances, stated:

> GHP standing alone does not merit tax-exempt status
> under section 501(c)(3). GHP cannot say that it
> provides any health care services itself. Nor does it
> ensure that people who are not GHP subscribers have
> access to health care or information about health care.
> According to the record, it neither conducts research
> nor offers educational programs, much less educational
> programs open to the public. It benefits no one but
> its subscribers. [Id. at 1219.]

Further, the Court of Appeals attached little significance to

Geisinger HMO's subsidized dues program, stating in pertinent part:

> The mere fact that a person need not pay to belong does not necessarily mean that GHP, which provides services only to those who do belong, serves a public purpose which primarily benefits the community. The community benefited is, in fact, limited to those who belong to GHP since the requirement of subscribership remains a condition precedent to any service. Absent any additional indicia of a charitable purpose, this self-imposed precondition suggests that GHP is primarily benefiting itself (and, perhaps, secondarily benefiting the community) by promoting subscribership throughout the areas it serves. [Id. at 1219.]

Although concluding that Geisinger HMO did not qualify for tax-exempt status on its own, the Court of Appeals remanded the case to the Court for a determination whether the Geisinger HMO qualified for exemption as an "integral part" of its tax-exempt parent. Id. at 1220.[9]

Integral Part Test

In Geisinger III, we held that the administrative record did not support Geisinger HMO's claim that it was entitled to tax-exempt status as an integral part of the Geisinger system. Geisinger Health Plan v. Commissioner, 100 T.C. at 404-405. As a preliminary matter, we concluded that an HMO may qualify for tax-exempt status as an integral part of a related tax-exempt entity

---

[9] The integral part doctrine is not codified, but its genesis may be found in sec. 1.502-1(b), Income Tax Regs., which states that a subsidiary may qualify for tax-exempt status "on the ground that its activities are an integral part of the exempt activities of the parent organization".

if its activities are carried out under the supervision or control of the tax-exempt affiliate and the HMO's activities would not constitute an unrelated trade or business if conducted by the tax-exempt affiliate.  Id. at 402, 404-405.  We looked to section 513(a) which defined an unrelated trade or business in pertinent part as:

> "any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of * * * [the] purpose or function constituting the basis for its exemption". * * *  [Id. at 405.]

Because Geisinger HMO enrollees received medical services from hospitals outside of the Geisinger system, and because the administrative record lacked evidence as to whether such services were substantial, we were unable to conclude that Geisinger HMO's activities were substantially related to the activities of its tax-exempt affiliates.  Id. at 405-406.

In Geisinger IV, the Court of Appeals affirmed our holding in Geisinger III, albeit on slightly different grounds. Geisinger Health Plan v. Commissioner, 30 F.3d at 501.  The Court of Appeals held that an organization may qualify for tax-exempt status as an integral part of its tax-exempt parent if: (1) the organization is not carrying on a trade or business which would be an unrelated trade or business if regularly carried on by its tax-exempt parent; and (2) the organization's relationship with

its tax-exempt parent somehow enhances or "boosts" its own tax-exempt character to the point that the organization would qualify for tax-exempt status.  Id.  Focusing solely on the latter issue, the Court of Appeals concluded that Geisinger HMO was not entitled to tax-exempt status because it did not receive the necessary boost from its relationship with exempt Geisinger entities.  In particular, the Court of Appeals held:

> As our examination of the manner in which * * * [Geisinger HMO] interacts with other entities in the System makes clear, its association with those entities does nothing to increase the portion of the community for which * * * [Geisinger HMO] promotes health--it serves no more people as a part of the System than it would serve otherwise. * * *  [Id. at 502.]

Under the circumstances, the Court of Appeals concluded that it was unnecessary to consider whether Geisinger HMO's activities would constitute an unrelated trade or business if regularly carried on by a related tax-exempt entity.  Id. at 501.

Analysis

Consistent with the preceding discussion, petitioner's qualification for exemption pursuant to section 501(a) as an organization described in section 501(c)(3) initially depends upon whether petitioner satisfies the community benefit test.  In the event that petitioner cannot satisfy the community benefit test, we must consider whether petitioner nevertheless qualifies for exemption as an integral part of a related tax-exempt entity.

Whether Petitioner Satisfies The Community Benefit Test

The community benefit test requires consideration of a variety of factors that indicate whether an organization is involved in the promotion of health on a community-wide basis. See Sound Health Association v. Commissioner, 71 T.C. at 181-185 (comparing Sound Health Association's operations with "hospital A" in Rev. Rul. 69-545, 1969-2 C.B. 117.)  Considering all the facts and circumstances surrounding petitioner's operations, even though petitioner is instrumental in arranging for the provision of health care to a large number of individuals in the geographic area that it serves, we are not persuaded that petitioner provides a meaningful community benefit.  Accordingly, petitioner does not qualify for tax-exempt status as an organization described in section 501(c)(3) based upon the provision of a community benefit.

Significantly, unlike the HMOs in Geisinger Health Plans v. Commissioner, supra, and Sound Health Association v. Commissioner, supra, petitioner did not offer its health plans to the general public.  Petitioner only offered its IHC Care health plan to employees of large employers; i.e., employers with more than 100 employees.  Moreover, petitioner no longer offers its IHC Senior Care plan to Medicare patients.  In sum, petitioner

operates in a manner that substantially limits its universe of potential enrollees.

Against this backdrop, we further note that, unlike the HMO in Sound Health Association v. Commissioner, supra, petitioner did not own or operate its own medical facilities, nor did petitioner employ its own physicians. Consequently, petitioner could not provide free medical care to those otherwise unable to pay for medical services. Additionally, petitioner did not establish a subsidized premiums program, conduct research, or offer free education programs to the public. Petitioner's Core Wellness Program was offered exclusively to its enrollees.

We recognize that petitioner's operations, and particularly petitioner's practice of setting premiums based upon an adjusted community rating system, likely allowed its enrollees to obtain medical care at a lower cost than might otherwise have been available. However, the benefit associated with these cost savings is more appropriately characterized as a benefit to petitioner's enrollees as opposed to the community at large.

In sum, the record does not establish that petitioner provides a community benefit that would qualify petitioner for tax-exempt status pursuant to section 501(c)(3). We next consider whether petitioner qualifies for tax-exempt status as an integral part of a related tax-exempt entity.

2.  Whether Petitioner Satisfies The Integral Part Test

In Geisinger III, we concluded that an organization may qualify for exemption as an integral part of a tax-exempt affiliate if:  (1) The organization's activities are carried out under the supervision or control of a tax-exempt affiliate, and (2) such activities would not constitute an unrelated trade or business if conducted by a related tax-exempt entity.  Geisinger Health Plans v. Commissioner, 100 T.C. at 402-405.  There is no dispute that petitioner's activities were carried out under the supervision and control of IHC--a tax-exempt affiliate.  Thus, we turn to the question whether petitioner's activities would constitute an unrelated trade or business if conducted by a related tax-exempt entity.

In Geisinger III, we held that, because Geisinger HMO enrollees received some hospital services from independent hospitals, Geisinger HMO had to show that its overall operations were substantially related to the functions of its tax-exempt affiliates.  Id. at 405.  We stated:

> If petitioner's activities are "conducted on a scale
> larger than is 'reasonably necessary'" to accomplish
> the purposes of the exempt entities, there is no
> substantial relationship within the meaning of the
> regulations.  Hi-Plains Hospital v. United States, 670
> F.2d at 530-531; sec. 1.513-1(d)(3), Income Tax Regs.

Id. at 406.

Although Geisinger HMO enrollees received all of their

physician services through Clinic, an exempt affiliate, Geisinger HMO enrollees received approximately 20 percent of their hospital services from independent hospitals.  Because the record did not disclose why Geisinger HMO enrollees received hospital services from hospitals outside of the Geisinger system, we were unable to conclude that Geisinger HMO's operations were substantially related to the functions of its tax-exempt affiliates.  Id. at 404-406.

Like Geisinger HMO, petitioner neither owned nor operated any medical facilities and did not employ any physicians or health care professionals.  Petitioner fulfilled its obligation to provide medical services to its enrollees by contracting with physicians (both physicians employed by Health Services and independent physicians) and hospitals (both Health Services hospitals and independent hospitals) to provide such services. In contrast to Geisinger HMO, however, the administrative record in this case indicates that the medical services that petitioner's enrollees received from independent hospitals were largely attributable to admissions to either UMC or Davis Hospital and Medical Center.  Further, these admissions were undertaken to:  (1) Take advantage of specialized services (such as burn treatment and pain management) provided at UMC; (2) address occasional shortages of psychiatric beds in Health Services hospitals; and (3) accommodate petitioner's enrollees

living in Davis County, Utah, where Health Services lacked a hospital.  Because the circumstances under which petitioner's enrollees received hospital services from independent hospitals were limited to situations where Health Services was unable to provide specialized hospital services or were due to geographical expediency, or both, we are satisfied that petitioner's method for arranging for its enrollees to receive hospital services was substantially related to Health Services' tax-exempt function.

However, we do not end our analysis here.  In particular, the administrative record reveals that petitioner's enrollees received a substantial portion of their physician services from independent physicians.

In Geisinger III, we did not discuss the provision of physician services to Geisinger enrollees inasmuch as Geisinger HMO arranged for its enrollees to receive all their physician services from Clinic--a tax-exempt affiliate of Geisinger HMO. Clinic in turn arranged to provide physician services to Geisinger enrollees through its approximately 400 physician/employees (approximately 84 percent of services) and through contracts with independent physicians (approximately 16 percent of services).  In contrast, in the instant case, petitioner's enrollees received only 21 percent of their physician services from physicians employed by or contracting with Health Services, while petitioner contracted for the

remaining 79 percent of such physician services directly with independent physicians.  In other words, petitioner's enrollees received nearly 80 percent of their physician services from physicians with no direct link to one of petitioner's tax-exempt affiliates.

Petitioner contends that its contracts with independent physicians are not relevant to the question of whether it qualifies for tax-exempt status as an integral part of its tax-exempt IHC affiliates because all such independent physicians were required to maintain privileges at Health Services' hospitals.  We disagree with the basic premise underlying petitioner's argument.

Health Services was composed of the hospital division, which operated a large number of hospitals and clinics, and the physician division, which employed 245 primary care physicians and 215 specialist physicians who generally practiced in Health Services' clinics and other community-based settings.  Health Services' status as an organization described in section 501(c)(3) is undoubtedly attributable to its willingness to provide charity services and its participation in Medicare, Medicaid, and other Government programs.  Considering that petitioner does not provide free or low cost health services, and given the termination of its IHC Senior Care plan for Medicare patients, we fail to see how petitioner's operations, including

its heavy reliance on independent physicians, would be essential to or substantially related to Health Services' exempt functions. To the contrary, petitioner's method of arranging for its enrollees to receive physician services suggests that petitioner conducted its operations on a scale "larger than is reasonably necessary to accomplish the purposes of the exempt entities". Geisinger Health Plans v. Commissioner, 100 T.C. at 406.[10]

In sum, petitioner does not provide the community benefit required for petitioner to qualify as an organization described in section 501(c)(3).  Further, petitioner's operations are not essential to or substantially related to Health Services' exempt functions.  Consequently, petitioner is not entitled to the declaratory judgment it seeks.

To reflect the foregoing,

Decision will be entered

for respondent.

---

[10]     Under the circumstances, we need not consider whether we would apply the "boost" test set forth in Geisinger Health Plan v. Commissioner, 30 F.3d 494, 501 (3d Cir. 1994).  In addition, we need not consider respondent's alternative contention that petitioner is not entitled to tax-exempt status pursuant to sec. 501(m) which provides that an organization described sec. 501(c)(3) shall not be entitled to tax-exempt status if a substantial part of its activities consists of providing commercial-type insurance.