United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 7, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

————————

No. 02-50959
Consolidated with
No. 02-51312

————————

ST. DAVID'S HEALTH CARE SYSTEM,

Plaintiff-Appellee,

versus

UNITED STATES OF AMERICA,

Defendant-Appellant.

Appeals from the United States District Court
For the Western District of Texas

Before EMILIO M. GARZA, DENNIS, Circuit Judges, and VANCE[*], District Judge.

EMILIO M. GARZA, Circuit Judge:

St. David's Health Care System, Inc. ("St. David's") brought suit in federal court to recover

taxes that it paid under protest. St. David's argued that it was a charitable hospital, and therefore tax-

exempt under 26 U.S.C. § 501(c)(3). The Government responded that St. David's was not entitled

———————————

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

to a tax exemption because it had formed a partnership with a for-profit company and ceded control over its operations to the for-profit entity. Both St. David's and the Government filed motions for summary judgment. The district court granted St. David's motion, and ordered the Government to refund the taxes paid by St. David's for the 1996 tax year. The district court also ordered the Government to pay $951,569.83 in attorney's fees and litigation costs. The Government filed the instant appeal. We conclude that this case raises genuine issues of material fact, and that the district court thus erred in granting St. David's motion for summary judgment. We therefore vacate the district court's decision, and remand for further proceedings.

I

For many years, St. David's owned and operated a hospital and other health care facilities in Austin, Texas. For most of its existence, St. David's was recognized as a charitable organization entitled to tax-exempt status under § 501(c)(3).[1]

In the 1990s, due to financial difficulties in the health care industry, St. David's concluded that it should consolidate with another health care organization. Ultimately, in 1996, St. David's decided to form a partnership with Columbia/HCA Healthcare Corporation ("HCA"), a for-profit company that operates 180 hospitals nationwide. HCA already owned several facilities in the suburbs of Austin, and was interested in entering the central Austin market. A partnership with St. David's

---

[1] Non-profit organizations that are "organized and operated exclusively for religious, charitable, scientific, . . . literary or educational purposes" can qualify for a tax exemption under § 501(c)(3). 26 U.S.C. § 501(c)(3). Although the statutory provision does not specifically mention medical care, the Internal Revenue Service ("IRS") has long viewed the provision of health care as a "charitable" purpose under § 501(c)(3). *See Geisinger Health Plan v. Commissioner*, 985 F.2d 1210, 1216 (3d Cir. 1993); *see also* Rev. Rul. 69-545, 1969-2 C.B. 117 (1969) ("The promotion of health . . . is one of the purposes in the general law of charity that is deemed beneficial to the community as a whole[.]").

would allow HCA to expand into that urban market.

St. David's contributed all of its hospital facilities to the partnership. HCA, in turn, contributed its Austin-area facilities. The partnership hired Galen Health Care, Inc. ("Galen"), a subsidiary of HCA, to manage the day-to-day operations of the partnership medical facilities.

In 1998, the IRS audited St. David's and concluded that, due to its partnership with HCA, St. David's no longer qualified as a charitable (and, thus, tax-exempt) hospital. The IRS ordered St. David's to pay taxes. St. David's paid the requisite amount under protest, and subsequently filed the instant action, requesting a refund.

The parties filed cross-motions for summary judgment. The district court granted the motion filed by St. David's and ordered the Government to refund the taxes paid by the hospital for the 1996 tax year. The court also decided that, because the Government's position (that St. David's was not entitled to an exemption) was not substantially justified, the Government should pay attorney's fees and other litigation costs in the amount of $951,569.83. *See* 26 U.S.C. § 7430(c)(4)(A),(B) (indicating that the "prevailing party" in a tax case is entitled to attorney's fees and costs, unless the Government is the non-prevailing party and establishes that its position was "substantially justified"). The Government filed this appeal.

II

We review the district court's ruling on a motion for summary judgment *de novo*, applying the same legal standard as the district court. *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 408 (5th Cir. 2002). Summary judgment should be granted only when there is "no genuine issue as to any material fact[.]" FED. R. CIV. P. 56(c); *Wyatt*, 297 F.3d at 408-09. An issue of fact is material only "if its resolution could affect the outcome of the action." *Wyatt*, 297 F.3d at 409.

-3-

In determining whether there is a dispute as to any material fact, we consider all of the evidence in the record, but we do not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000). Instead, we "draw all reasonable inferences in favor of the nonmoving party[.]" *Id.*; *Wyatt*, 297 F.3d at 409. If we determine, after accepting the facts as presented by the nonmoving party, that "the moving party is entitled to a judgment as a matter of law," we affirm the grant of summary judgment. FED. R. CIV. P. 56(c).

The Government claims that the district court erred in concluding that St. David's was entitled to § 501(c)(3) tax-exempt status. The burden was on St. David's to prove that it qualified for a tax exemption. *See Nationalist Movement v. Commissioner*, 37 F.3d 216, 219 (5th Cir. 1994); *Senior Citizens Stores, Inc. v. United States*, 602 F.2d 711, 713 (5th Cir. 1979) ("It is the burden of the party claiming the exemption . . . to prove entitlement to it.").

In order to qualify for tax-exempt status, St. David's was required to show that it was "organized and operated exclusively" for a charitable purpose. 26 C.F.R. § 1.501(c)(3)-1(a). The "organizational test" required St. David's to demonstrate that its founding documents: (1) limit its purpose to "one or more exempt purposes"; and (2) do not expressly empower St. David's to engage more than "an insubstantial part of its activities" in conduct that fails to further its charitable goals. *Id.* § 1.501(c)(3)-1(b). The parties agree that St. David's articles of incorporation satisfy the organizational test.

To pass the "operational test," St. David's was required to show: (1) that it "engage[s] primarily in activities which accomplish" its exempt purpose; (2) that its net earnings do not "inure to the benefit of private shareholders or individuals"; (3) that it does "not expend a substantial part of its resources attempting to influence legislation or political campaigns"; and (4) that it "serve[s]

-4-

a valid purpose and confer[s] a public benefit." *Nationalist Movement*, 37 F.3d at 219-20. The parties appear to agree that, because St. David's contributed all of its medical facilities to the partnership, we must look to the activities of the partnership to determine if St. David's satisfies the operational test.

The Government argues that St. David's cannot demonstrate the first element of the operational test.[2] The Government asserts that, because of its partnership with HCA, St. David's cannot show that it engages "primarily" in activities that accomplish its charitable purpose. The Government does not contend that a non-profit organization should automatically lose its tax-exempt status when it forms a partnership with a for-profit entity. Instead, the Government argues that a non-profit organization must sacrifice its tax exemption if it cedes control over the partnership to the for-profit entity. The Government asserts that, when a non-profit cedes control, it can no longer ensure that its activities via the partnership primarily further its charitable purpose. In this case, the Government contends that St. David's forfeited its exemption because it ceded control over its operations to HCA.

St. David's responds in part that the central issue in determining its tax-exempt status is not which entity *controls* the partnership. Instead, St. David's appears to assert, the pivotal question is one of *function*: whether the partnership engages in activities that further its exempt purpose. St. David's argues that it passes the "operational test" because its activities via the partnership further its charitable purpose of providing health care to all persons.

St. David's relies in particular on a revenue ruling issued by the IRS, which provides guidelines for hospitals seeking a § 501(c)(3) exemption. Revenue Ruling 69-545 sets forth what has

---

[2] The parties agree that St. David's satisfies the other three elements of the test.

come to be known as the "community benefit standard." *See IHC Health Plans, Inc. v. Commissioner*, 325 F.3d 1188, 1197 (10th Cir. 2003); *see also* Rev. Rul. 83-157, 1983-2 C.B. 94 (1983) (noting that hospitals can be tax-exempt if various factors demonstrate that the "hospitals operate exclusively to the benefit of the community"). The IRS generally accords tax-exempt status to independent non-profit hospitals that satisfy this standard.

Under the "community benefit standard," a non-profit hospital can qualify for a tax exemption if it: (1) provides an emergency room open to all persons, regardless of their ability to pay; (2) is willing to hire any qualified physician; (3) is run by an independent board of trustees composed of representatives of the community ("community board"); and (4) uses all excess revenues to improve facilities, provide educational services, and/or conduct medical research. *See* Rev. Rul. 69-545, 1969-2 C.B. 117 (1969) (outlining the community benefit standard); *see also IHC Health Plans*, 325 F.3d at 1197 n.16 (noting several relevant factors for determining whether a hospital confers a significant community benefit, including the provision of free or below-cost care; the treatment of individuals eligible for Medicare or Medicaid; the use of extra funds for research and educational programs; and the composition of the board of trustees). A hospital need not demonstrate all of these factors in order to qualify for § 501(c)(3) tax-exempt status. *See Geisinger*, 985 F.2d at 1219; Rev. Rul. 69-545, 1969-2 C.B. 117 (1969) (stating that "[t]he absence of particular factors" will not necessarily prevent a hospital from obtaining an exemption); *see also* Rev. Rul. 83-157, 1983-2 C.B. 94 (1983) (noting that, under certain circumstances, a hospital can satisfy the community benefit standard even if it does not provide free emergency room care). Instead, the hospital must show, based on the "totality of the circumstances," that it is entitled to a tax exemption. *Geisinger*, 985 F.2d at 1219.

St. David's contends that its activities via the partnership more than satisfy the community

benefit standard. St. David's notes that the partnership hospitals perform a number of charitable functions in the Austin community. According to St. David's, the partnership not only provides free emergency room care, but also has opened the rest of its facilities to all persons, regardless of their ability to pay.[3] In addition, St. David's asserts, the partnership hospitals maintain open medical staffs. Finally, St. David's states that it uses the profits that it receives from the partnership revenues to fund research grants and other health-related initiatives.[4]

We have no doubt that St. David's via the partnership provides important medical services

---

[3] The Government suggests that there is a factual dispute regarding whether the partnership provides free care, because the partnership hospitals seek to collect payment from all patients. However, as the Government concedes in its original brief, "collection efforts do not definitively indicate that . . . care [is] not charitable." *See also Maynard Hosp., Inc. v. Commissioner*, 52 T.C. 1006, 1026 (1969) (indicating that "charitable services" may include collection attempts, as long as "[p]atients who were found unable to pay their bills often had them reduced or entirely canceled"). The arguments made by the Government regarding St. David's collection efforts fail to create a genuine issue of fact as to whether the partnership facilities dispense charity care.

[4] The Government contends that the partnership hospitals do not satisfy the community benefit standard, because the partnership lacks a community board. The Government notes that half of the members of the partnership's Board of Governors are appointed by HCA, and that two of the members appointed by St. David's are physicians at partnership hospitals. The Government contends that these individuals have a financial interest in the partnership hospitals, and therefore cannot be deemed "independent" representatives of the community who are likely to give a high priority to charitable concerns. *Cf.* Rev. Rul. 69-545, 1969-2 C.B. 117 (1969) (indicating that a hospital is more likely to perform charitable work that benefits the community if its board of directors is composed of independent community members, and not composed of individuals who have a financial interest in the hospital).

The Government may be correct in asserting that the partnership does not have a community board. However, this fact does not suggest that the partnership hospitals fail to meet the community benefit standard. As we have just explained, a hospital need not demonstrate every factor set forth in Revenue Ruling 69-545 in order to qualify for a tax exemption. The partnership hospitals can therefore satisfy the community benefit standard, whether or not they are run by an independent community board.

to the Austin community.[5]  Indeed, if the issue in this case were whether the partnership performed any charitable functions, we would be inclined to affirm the district court's grant of summary judgment in favor of St. David's.

However, we cannot agree with St. David's suggestion that the central issue in this case is whether the partnership provides some (or even an extensive amount of) charitable services.  It is important to keep in mind that § 501(c)(3) confers tax-exempt status only on those organizations that operate *exclusively* in furtherance of exempt purposes.  26 C.F.R. § 1.501(c)(3)-1(a).  As a result, in determining whether an organization satisfies the operational test, we do not simply consider whether the organization's activities further its charitable purposes.  We must also ensure that those activities do *not* substantially further other (non-charitable) purposes.  If more than an "insubstantial" amount of the partnership's activities further non-charitable interests, then St. David's can no longer be deemed to operate *exclusively* for charitable purposes.  *See Nationalist Movement*, 37 F.3d at 220 ("'An organization will not be . . . regarded [as operated exclusively for an exempt purpose] if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.'") (quoting 26 C.F.R. § 1.501(c)(3)-1(c)(1)).[6]

Therefore, even if St. David's performs important charitable functions, St. David's cannot qualify for tax-exempt status under § 501(c)(3) if its activities via the partnership substantially further

---

[5] The amicus brief filed by the City of Austin confirms that St. David's performs important charitable work in the Austin area.

[6] As St. David's points out, the requirement that an organization operate "exclusively" for exempt purposes is not as absolute as the term "exclusive" might make it appear.  An organization can be deemed to operate exclusively for exempt purposes if it engages "primarily" in activities that further its charitable purposes.  *See Nationalist Movement*, 37 F.3d at 219.  Nonetheless, an organization cannot be deemed to operate exclusively *or primarily* for charitable purposes when a substantial portion of the organization's activities further non-charitable purposes.

the private, profit-seeking interests of HCA. *See id.* at 220 ("'[T]he presence of a single [non-exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] purposes.'") (quoting *Better Business Bureau of Washington, D.C. v. United States*, 326 U.S. 279, 283 (1945)); *cf. Est of Hawaii v. Commissioner*, 71 T.C. 1067, 1078-79 (1979) ("The operational test focuses on the *purpose rather than the nature* of an organization's activities.") (citation omitted) (emphasis added).

In order to ascertain whether an organization furthers non-charitable interests, we can examine the structure and management of the organization. *See Church of Ethereal Joy v. Commissioner*, 83 T.C. 20, 22-23 (1984). In other words, we look to which individuals or entities *control* the organization. *See id.* at 23; *see also Lowry Hosp. Ass'n v. Commissioner*, 66 T.C. 850, 859-60 (1976) (concluding that a hospital could not be deemed to operate exclusively for charitable purposes, partly because of the "control and dominance" exercised by a single physician over the hospital's affairs). If private individuals or for-profit entities have either formal or effective control, we presume that the organization furthers the profit-seeking motivations of those private individuals or entities. That is true, even when the organization is a partnership between a non-profit and a for-profit entity.[7] *See Redlands Surgical Servs. v. Commissioner*, 113 T.C. 47, 75 (1999) ("An organization's property may be impermissibly devoted to a private use where private interests have control, directly or indirectly, over its assets, and thereby secure nonincidental private benefits.").[8]

_____

[7] For purposes of simplicity, we use the term "partnership" to refer to a number of similar combinations between non-profit organizations and for-profit entities, including limited partnerships and limited liability companies.

[8] In *Redlands*, the tax court was presented with a situation that, in many ways, resembles the present case. In *Redlands*, a non-profit organization formed a partnership with a for-profit entity to operate a surgical center. 113 T.C. at 48, 64. The tax court stated that the non-profit would not

When the non-profit organization cedes control over the partnership to the for-profit entity, we assume that the partnership's activities substantially further the for-profit's interests. As a result, we conclude that the non-profit's activities via the partnership are not exclusively or primarily in furtherance of its charitable purposes. Thus, the non-profit is not entitled to a tax exemption. *See* Rev. Rul. 98-15, 1998-1 C.B. 718 (1998) ("[I]f a private party is allowed to control or use the non-profit organization's activities or assets for the benefit of the private party, and the benefit is not incidental to the accomplishment of exempt purposes, the organization will fail to be organized and operated exclusively for exempt purposes."); *see also Est of Hawaii*, 71 T.C. at 1080 (concluding that a non-profit could not qualify for tax-exempt status, because it was effectively, although not formally, controlled by for-profit interests); *cf. Church of Ethereal Joy*, 83 T.C. at 23 ("Although control by . . . a small group may not necessarily disqualify [an organization] for exemption, it provides an obvious opportunity for abuse of the claimed tax-exempt status.") (internal quotation marks omitted).

---

automatically lose its tax-exempt status because it had entered a partnership with a for-profit entity. *Id.* at 74-75. However, the court indicated, the non-profit organization might not qualify for a tax exemption if it lacked control over the partnership. *See id.* at 75. The non-profit organization in *Redlands* argued that the central issue was not one of control. *Id.* at 77. Instead, the non-profit contended, the central question should be whether the partnership in fact performed charitable work. *Id.* The tax court rejected this position, and appeared to conclude that the central issue was indeed one of control. *See id.* at 78 ("To the extent that [the non-profit organization] cedes control over its sole activity to for-profit parties having an independent economic interest in the same activity and having no obligation to put charitable purposes ahead of profit-making objectives, [the non-profit] cannot be assured that the partnerships will in fact be operated in furtherance of charitable purposes. In such a circumstance, we are led to the conclusion that [the non-profit] is not operated exclusively for charitable purposes."). The Ninth Circuit, in a short per curiam opinion, affirmed. *Redlands Surgical Servs. v. Commissioner*, 242 F.3d 904, 904-05 (9th Cir. 2001). Notably, the court of appeals stated that "we adopt the tax court's holding that [the non-profit organization] *has ceded effective control* over the operations of the partnerships and the surgery center to private parties, conferring impermissible private benefit." *Id.* at 904 (internal quotation marks omitted) (emphasis added).

Conversely, if the non-profit organization enters into a partnership agreement with a for-profit entity, and retains control, we presume that the non-profit's activities via the partnership primarily further exempt purposes. Therefore, we can conclude that the non-profit organization should retain its tax-exempt status. *See Plumstead Theatre Soc'y, Inc. v. Commissioner*, 74 T.C. 1324, 1334 (1980) (concluding that a non-profit theater organization could retain its tax-exempt status, even after forming a limited partnership with a for-profit entity, in part because "[t]he limited partners have no control over the way [the non-profit organization] operates or manages its affairs"); *see also Broadway Theatre League of Lynchburg, Va., Inc. v. United States*, 293 F. Supp. 346, 354 (W.D. Va. 1968) (concluding that a non-profit theater group could maintain its tax-exempt status, even after entering a contract with a for-profit booking agent, because the contract did not give the agent control over the operations of the non-profit).

The present case illustrates why, when a non-profit organization forms a partnership with a for-profit entity, courts should be concerned about the relinquishment of control. St. David's, by its own account, entered the partnership with HCA out of financial *necessity* (to obtain the revenues needed for it to stay afloat). HCA, by contrast, entered the partnership for reasons of financial *convenience* (to enter a new market). The starkly different financial positions of these two parties at the beginning of their partnership negotiations undoubtedly affected their relative bargaining strength. Because St. David's "needed" this partnership more than HCA, St. David's may have been willing to acquiesce to many (if not most) of HCA's demands for the final Partnership Agreement. In the process, of course, St. David's may not have been able to give a high priority to its charitable objectives. As a result, St. David's may not have been able to ensure that its partnership with HCA would continually provide a "public benefit" as opposed to a private benefit for HCA. *Cf. IHC*

*Health Plans*, 325 F.3d at 1195 (noting that tax exemptions under § 501(c)(3) constitute a kind of "*quid pro quo*" and "'are justified on the basis that the exempt entity confers a *public benefit*—a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues'") (quoting *Bob Jones Univ. v. United States*, 461 U.S. 574, 591 (1983)) (emphasis in original).

These precedents and policy concerns indicate that, when a non-profit organization forms a partnership with a for-profit entity, the non-profit should lose its tax-exempt status if it cedes control to the for-profit entity. *See Redlands*, 242 F.3d at 904 (holding that a non-profit organization is no longer entitled to tax-exempt status when it "has ceded effective control . . . to private parties") (internal quotation marks omitted). Therefore, in our review of the district court's summary judgment ruling, we examine whether St. David's has shown that there is no genuine issue of material fact regarding whether St. David's ceded control to HCA.

A recent IRS revenue ruling provides a starting point for our analysis. In Revenue Ruling 98-15, the IRS indicated how a non-profit organization that forms a partnership with a for-profit entity can establish that it has retained control over the partnership's activities. *See* Rev. Rul. 98-15, 1998-1 C.B. 718 (1998). The revenue ruling states that a non-profit can demonstrate control by showing some or all of the following: (1) that the founding documents of the partnership expressly state that it has a charitable purpose and that the charitable purpose will take priority over all other concerns; (2) that the partnership agreement gives the non-profit organization a majority vote in the partnership's board of directors; and (3) that the partnership is managed by an independent company

(an organization that is not affiliated with the for-profit entity). *See id.*[9]

The partnership documents in the present case, examined in light of the above factors, leave us uncertain as to whether St. David's has ceded control to HCA. St. David's did manage to secure some protections for its charitable mission. First of all, Section 3.2 of the Partnership Agreement expressly states that the manager of the partnership "shall" operate the partnership facilities in a manner that complies with the community benefit standard.[10] This provision appears to comport with

_____

[9] We generally accord significant weight to the determinations of the IRS in its revenue rulings. *See Estate of McLendon v. Commissioner*, 135 F.3d 1017, 1023 n.10 (5th Cir. 1998) ("In this circuit, revenue rulings are generally given weight as expressing the studied view of the agency whose duty it is to carry out the statute.") (internal quotation marks omitted); *but see also id.* at 1024 (noting that revenue rulings are "clearly less binding on the courts than treasury regulations or Code provisions").

St. David's contends that the most relevant IRS guideline is Revenue Ruling 69-545. As discussed above, that ruling lists the factors that govern whether a hospital (acting independently) can be deemed a charitable organization. *See* Rev. Rul. 69-545, 1969-2 C.B. 117 (1969). Revenue Ruling 69-545, however, is not directly on point. The ruling does not address the situation presented by this case: how a charitable hospital can retain its tax-exempt status when it forms a partnership with a for-profit entity. Revenue Ruling 98-15, which expressly deals with that issue, serves as a better guide in the instant case.

[10] Section 3.2 of the Partnership Agreement states:

> In furtherance of the purposes of the Partnership described in Section 3.1, the Manager shall cause the Facilities to conduct the business and operations of the Partnership in such a manner as to satisfy the community benefits standard generally required of hospitals under Section 501(c)(3) of the Code of (i) accepting Medicare and Medicaid patients, (ii) accepting all patients in an emergency condition in their emergency rooms without regard to the ability of such emergency patients to pay, (iii) maintaining open medical staffs, (iv) providing public health programs of educational benefit to the community, and (v) generally promoting the health, wellness and welfare of the community by providing quality health care at a reasonable cost. The Partnership intends to operate its business in such a manner so as not to jeopardize the status of [St. David's] or the [St. David's] Affiliates, to the extent applicable, as organizations described in Section

-13-

the first factor in Revenue Ruling 98-15, which indicates that the partnership's founding documents

should contain a statement of the partnership's charitable purpose. *See* Rev. Rul. 98-15, 1998-1 C.B.

718 (1998) (indicating that "[t]he governing documents" of the partnership should "commit [the

partnership] to providing health care services for the benefit of the community as a whole and to give

charitable purposes priority over maximizing profits"); *compare Redlands*, 113 T.C. at 78-79 (noting,

as a factor suggesting that the non-profit organization lacked control, that the partnership documents

did not expressly state that the partnership had a charitable mission).[11]   St. David's asserts that if

Galen, the manager of the partnership facilities, fails to adhere to this requirement, St. David's can

sue in Texas state court for specific performance of the Partnership Agreement.

The Management Services Agreement between Galen and the Partnership further provides

that, if Galen takes any action with a "material probability of adversely affecting" St. David's tax-

---

501(c)(3) of the Code.

[11] The Government contends that Section 3.2 of the Partnership Agreement does not meet the standard established by Revenue Ruling 98-15.  The Government argues that it is not sufficient for a partnership agreement to state that a manager "shall" abide by the community benefit standard; the agreement must also *expressly* require the manager to place charitable concerns above other goals.

We are not persuaded by the Government's narrow interpretation of Revenue Ruling 98-15. The term "shall" clearly indicates that the manager of this partnership is required to abide by the community benefit standard.  *See Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001) ("The word 'shall' is mandatory in meaning."); *In re DP Partners Ltd. P'ship*, 106 F.3d 667, 670-71 (5th Cir. 1997) ("Use of the word 'shall' connotes a mandatory intent.").  The mandatory nature of Section 3.2 is further evidenced by the specificity of the provision: it carefully lays out the manner in which the manager "shall" adhere to the community benefit standard.  *See supra* note 10.

As our discussion below indicates, Section 3.2 cannot, standing alone, ensure that St. David's has an adequate amount of control over partnership operations.  Other provisions of the partnership documents must provide St. David's with an effective means of enforcing the manager's obligation to abide by the community benefit standard. *See infra.*  Nevertheless, as a purely textual matter, the purpose statement in Section 3.2 appears to comply with the first factor listed in Revenue Ruling 98-15.

exempt status, that action will be considered an "[e]vent of [d]efault." Management Services Agreement, section 7(d). The Management Services Agreement authorizes St. David's to unilaterally terminate the contract with Galen if it commits such a "default." *See* Management Services Agreement, section 7 ("If any Event of Default shall occur and be continuing, the non-defaulting party may terminate this Agreement . . . . Any action to be taken by the Partnership under this paragraph may be taken by the [St. David's] representatives on the Governing Board[.]").

In addition, St. David's can exercise a certain degree of control over the partnership via its membership on the partnership's Board of Governors. St. David's and HCA each appoint half of the Board. No measure can pass the Board without the support of a majority of the representatives of *both* St. David's and HCA. *See* Partnership Agreement, section 1.8 (noting that Board approval "means approval of not less than a majority of a quorum of [HCA] Governors and not less than a majority of a quorum of [St. David's] Governors"). Thus, through its voting power, St. David's can effectively veto any proposed action of the Board of Governors.

St. David's also contends that the Partnership Agreement gives it authority over the partnership's Chief Executive Officer ("CEO"). The agreement permitted St. David's to appoint the initial CEO, subject to the approval of the HCA members of the Board of Governors. *See* Partnership Agreement, section 8.2. The agreement further provides that either HCA or St. David's can unilaterally remove the CEO. *See id.* St. David's suggests that this termination power enables it to ensure that the CEO will promote charitable objectives.

Finally, St. David's argues that its power to dissolve the partnership provides it with a significant amount of control over partnership operations. The Partnership Agreement states that, if St. David's receives legal advice (from an attorney that has been deemed acceptable by both HCA

-15-

and St. David's) that its participation in the partnership will hinder its tax-exempt status, St. David's can request dissolution. *See* Partnership Agreement, section 15.1(f). St. David's asserts that it can use the threat of dissolution to force the partnership to give priority to charitable concerns.

According to St. David's, the above protections in the partnership documents (the purpose statement in the Partnership Agreement; St. David's power to terminate the Management Services Agreement and the CEO; its ability to block proposed action of the Board of Governors; and its power of dissolution) provide it with a large measure of control over partnership operations.

However, as the Government argues, there are reasons to doubt that the partnership documents provide St. David's with sufficient control. First of all, St. David's authority within the Board of Governors is limited. St. David's does not control a majority of the Board. *See* Rev. Rul. 98-15, 1998-1 C.B. 718 (1998) (indicating that a non-profit can retain control over a partnership with a for-profit if it selects a majority of the partnership's board of directors, but will have difficulty controlling the partnership if it has only an equal share of the board). As a result, although St. David's can veto board actions, it does not appear that it can initiate action without the support of HCA. Thus, at best, St. David's can prevent the partnership from taking action that might undermine its charitable goals; St. David's cannot necessarily ensure that the partnership will take new action that furthers its charitable purposes. *See Redlands*, 113 T.C. at 79-80 (finding that the non-profit did not have sufficient control in part because the non-profit could only veto partnership action; the non-profit could not initiate action without the consent of the for-profit entity).[12]

_____

[12] St. David's appears to contend that its authority to appoint the chairman of the Board of Governors, *see* Partnership Agreement, section 8.4(b)(i), gives it a significant amount of control over the Board. It is not clear, however, how this appointment power provides St. David's with any real authority. The Partnership Agreement does not appear to permit the chairman to make decisions or initiate action without the consent of the rest of the Board. *See* Partnership Agreement, section

Second, Galen, which manages the operations of the partnership on a day-to-day basis, is a for-profit subsidiary of HCA. As a result, it is not apparent that Galen would be inclined to serve charitable interests. It seems more likely that Galen would prioritize the (presumably non-charitable) interests of its parent organization, HCA. *See* Rev. Rul. 98-15, 1998-1 C.B. 718 (1998) (indicating that a charitable hospital is unlikely to be in control of a partnership with a for-profit entity when the partnership manager is a subsidiary of the for-profit entity); *see also Redlands*, 113 T.C. at 83-84 ("[T]his long-term management contract with an affiliate of [the for-profit entity] is a salient indicator of [the non-profit's] surrender of effective control over the [partnership's] operations").[13]

---

8.4(c) ("[N]o member of the Governing Board, acting alone, shall have the authority to act on behalf of the Governing Board."). Thus, it does not seem that the chairman could initiate any action without the support of a majority of the HCA representatives on the Board.

[13] Our concerns about Galen's affiliation with HCA are magnified by the fact that the partnership's contract with Galen appoints the manager for an extraordinarily long term. The Management Services Agreement states that Galen will remain the manager until 2050, as long as an HCA affiliate continues to be a general partner of the partnership. *See* Management Services Agreement, section 6. Such "job security" could make Galen less responsive to any allegations by St. David's that Galen was not managing the partnership in accordance with the community benefit standard. *See Redlands*, 113 T.C. at 82-83 (finding problematic the fact that the partnership was "locked into" a management contract with an affiliate of the for-profit partner, when the contract provided for a 15-year term and the possibility of renewing that term for two additional five-year periods).

In addition, part of Galen's fee is computed as a percentage (1%) of the partnership's net revenues. *See* Management Services Agreement, section 5(a). Such a contingency could give Galen an incentive to maximize revenues, and to neglect charitable goals. This fact, standing alone, does not necessarily preclude tax-exempt status for the non-profit partner. *See* Rev. Rul. 98-15, 1998-1 C.B. 718 (1998) (noting that a partnership paid its manager a fee based on the partnership's gross revenues, and nonetheless concluding that the non-profit member of the partnership was entitled to tax-exempt status). However, this fact, particularly when considered in light of Galen's relationship with HCA, does suggest that Galen will not be inclined to prioritize charitable goals. *See Redlands*, 113 T.C. at 80 (citing the fact that the manager "derive[d] a management fee computed as a percentage of gross revenues" as a factor suggesting that the partnership had a "significant profit-making objective").

-17-

Galen's apparent conflict of interest is only partly mitigated by the fact that Section 3.2 of the Partnership Agreement requires the manager to abide by the community benefit standard. As the Government points out, that requirement is useful only to the extent that the governing documents of the partnership empower St. David's to enforce the provision. St. David's appears to assert that the primary means through which it can force Galen to comply with Section 3.2 is by taking legal action. Given the time and expense of judicial proceedings, we doubt that St. David's will resort to litigation every time Galen makes a single decision that appears to conflict with the community benefit standard.

St. David's also asserts that it can control the management of the partnership via its position on the Board of Governors. However, the power of the Board is limited in scope. The Board of Governors is empowered to deal with only major decisions, not the day-to-day operation of the partnership hospitals.[14] Thus, St. David's could not, via its position on the Board, overrule a management decision that fell outside the range of the Board's authority.

The Management Services Agreement does appear to provide St. David's with a certain degree of control over Galen. The agreement permits St. David's to unilaterally cancel the contract with Galen if the manager takes action that has a "material probability" of undermining St. David's tax-exempt status. It is not entirely clear whether St. David's would be willing to exercise this termination option without the consent of HCA. Nor is it clear whether St. David's could ensure that Galen was replaced by a manager that would prioritize charitable purposes. Nonetheless, the

---

[14] The Board can consider matters such as: (1) amendments to the Partnership Agreement, the Management Services Agreement, and other major partnership documents; (2) sales of substantially all partnership assets; (3) approval of annual operating and capital budgets; (4) the hiring the partnership's CEO; (5) any change in the mission of the partnership; and (6) authorization of debt in excess of 10% of the partnership's assets. *See* Partnership Agreement, section 8.4(c).

Management Services Agreement does appear to give St. David's some authority over Galen, and therefore seems to provide St. David's with a degree of control over partnership operations.

We are also uncertain about the amount of control that St. David's exercises over the partnership's CEO. St. David's appears to assert that its authority to appoint the initial CEO, and its power to terminate the officer, demonstrate its control within the partnership. The Government has created a general issue of material fact, however, regarding St. David's by pointing to instances in which the CEO failed to comply with the Partnership Agreement. Although the Partnership Agreement states that the CEO "shall" provide the Board of Governors with annual reports of the amount of charity care, *see* Partnership Agreement, section 8.4(f), it seems that no such report was prepared for 1996 (the first year of the partnership and the tax year at issue in this case). Indeed, it does not appear that any annual report on charity care was prepared until after the IRS began auditing the partnership. Despite St. David's assertions about its power over the CEO, the non-profit does not claim to have taken *any* punitive action against the CEO for failing to prepare these reports. If St. David's was in fact unable to enforce a provision of the Partnership Agreement dealing specifically with charity care, that raises serious doubts about St. David's capacity to ensure that the partnership's operations further charitable purposes.

Finally, we question the degree to which St. David's has the power to control the partnership by threatening dissolution. First of all, the Partnership Agreement appears to permit St. David's to request dissolution only when there is a change in the law, not simply when the partnership fails to perform a few charitable functions. *See* Partnership Agreement, section 15.1(f) (indicating that the partnership "shall" be dissolved upon "[t]he request of [St. David's] for dissolution . . . in the event [St. David's] receives an opinion of counsel, from counsel reasonably acceptable to [St. David's] and

-19-

the [HCA] Governors, that as a result of a rule, regulation, statute, Internal Revenue Service government pronouncement, or court decision . . . enacted or issued subsequent to the date hereof which would cause the participation of [St. David's] or the [St. David's] Affiliates in the Partnership to be inconsistent with [their] Status . . . as organizations described in Section 501(c)(3) of the Code"). Second, HCA may not take seriously any threat of dissolution made by St. David's. HCA must be aware that St. David's has a strong incentive not to exercise its power to dissolve the corporation. The partnership documents include a non-compete clause, which provides that, in the event of dissolution, neither partner can compete in the Austin area for two years. *See* Contribution Agreement, section 11.1. That result might be slightly unpleasant for HCA, but would not destroy the entity; HCA would still have its nationwide health care business. For St. David's, by contrast, dissolution would be disastrous. St. David's serves only the Austin community. If it were forbidden from competing in that area, St. David's would (in effect) cease to exist. In light of the realities of the situation, it seems unlikely that St. David's would exercise its option to dissolve the partnership even if the partnership strayed from St. David's charitable mission.

The evidence presented by the parties demonstrates that there remain genuine issues of material fact regarding whether St. David's ceded control to HCA. Therefore, we vacate the district court's grant of summary judgment in favor of St. David's.[15]

For the above reasons, we VACATE the district court's summary judgment ruling and its award of attorney's fees and costs and REMAND for further proceedings.

---

[15] Because we vacate the district court's judgment, we need not address the other issue presented by the instant case: whether the district court abused its discretion in awarding attorney's fees and costs to St. David's. Because St. David's is no longer the prevailing party in this matter, it is not entitled to fees or costs. *See* 26 U.S.C. § 7430(c)(4)(A) (indicating that only the "prevailing party" is entitled to costs).